**In re Clifford Dale DIVINEY and Apryl Alyse Diviney, Debtors.**

**Clifford Dale DIVINEY and Apryl Alyse Diviney, Plaintiffs–Appellees,**

v.

**NATIONSBANK OF TEXAS, N.A., Defendant–Appellant.**

BAP No. NO–97–070.
Bankruptcy No. 96–04770.
Adversary No. 97–0040.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Oct. 16, 1998.

John B. Heatly, Fellers, Snider, Blakenship, Bailey & Tippens, Oklahoma City, OK, for Defendant–Appellant.

Mark A. Craige, Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, OK, for Plaintiffs–Appellees.

Before McFEELEY, Chief Judge, PUSATERI, and BOULDEN, Bankruptcy Judges.

## OPINION

PUSATERI, Bankruptcy Judge.

Creditor NationsBank of Texas, N.A. ("the Bank"), appeals from an order entered pursuant to 11 U.S.C. § 362(h) that found it had willfully violated the automatic stay and awarded the debtors actual damages of $2,850, attorney fees of $15,000, and punitive damages of $40,000. For the reasons set forth below, we AFFIRM the order of the bankruptcy court.

### I. Background.

Debtor Apryl Diviney purchased a 1988 Ford Tempo ("the Car") in August 1988. The Bank financed the purchase under the terms of a retail installment contract that provided for repayment of the debt over a sixty-month period. Approximately six weeks later, Ms. Diviney and her husband, Clifford Diviney ("the Debtors"), filed a Chapter 7 bankruptcy case in the Northern District of Texas ("the First Case"). The Bank was given notice of this case. Al-

though the Debtors indicated in their "Statement of Intentions" that they intended to retain the Car, a reaffirmation agreement was not made with the Bank. An order of discharge was entered in March 1989, and the Debtors retained the Car thereafter. In April 1992, the Debtors filed a Chapter 13 case in the same district ("the Second Case") in a failed attempt to save their home. This case was dismissed in February 1993. The Debtors retained the Car during this case, too.

Less than a month after dismissal of the Second Case and still in the same district, the Debtors filed *pro se* the Chapter 13 bankruptcy case ("the Third Case") that is the subject of this appeal. In their schedules, the Debtors listed the Bank's claim as $5,600, secured by the Car, worth $3,000. The Bank filed a proof of claim. Near the top of the proof of claim, it says the claim is secured, but further down, it states that the claim is secured only to the extent the Bank's security interest in the Car is sufficient to satisfy the claim. Part of the proof of claim contains blank areas to indicate the calculation of the balance due, separated into secured and unsecured columns, but these are all left blank except for the "payoff balance" space at the bottom of the secured column, where $5,798.87 is entered. However, below that is another space for stating the value of the collateral, and this space is left blank. The Bank interprets the proof of claim to describe the claim as fully secured.

In December 1993, Pamela Bassel, an attorney in Ft. Worth, Texas, entered her appearance on behalf of the Bank. Ms. Bassel filed a motion for relief from the automatic stay, asking that the Bank be allowed to enforce its rights and remedies against the Car. The parties negotiated a settlement and submitted an "Agreed Order Regarding the Automatic Stay" ("the Stay Order"), which the bankruptcy court entered in January 1994. The Stay Order required the Debtors to take any steps necessary to allow the Chapter 13 Trustee ("the Trustee") to make preconfirmation disbursements to the Bank. Presumably the Debtors fulfilled this obligation, because the Trustee's records show about $1,240 was disbursed to the Bank

before confirmation. The Order provided that if no plan was confirmed, the Trustee should disburse to the Bank as partial adequate protection all funds on hand that should have been paid to the Bank under the plan except to the extent the money was needed to pay administrative expenses. The Order provided that in the event the Debtors failed to make payments to the Trustee, the Bank could send written notification of their failure, and the Debtors would have ten days to cure the arrearage in full, or else be in default. It required the Debtors to maintain adequate insurance on the Car "throughout the pendency of this bankruptcy proceeding," or else be in default. The Debtors agreed in the Order that the Bank held a perfected security interest in the Car and could take any actions necessary to maintain its perfected security interest. The Order also contained a "drop dead" clause providing that in the event of the Debtors' default, the automatic stay would immediately terminate as to the Bank, and the Bank could repossess the Car without further notice.

The Debtors filed two plans, and then in April 1994, filed their "Final Chapter 13 Plan and Motion for Valuation" ("the Final Plan"), which valued the Bank's secured claim at $3,000 and proposed to amortize that claim over thirty-six months with interest at the rate of ten percent per annum. In its first section, the Final Plan listed five claims as belonging to unsecured creditors, including the balance of the Bank's claim, $2,798.87, and estimated these general unsecured claims would be paid ".00%." The third section of the Final Plan, labeled "Motion for Valuation," asked the court to value, for purposes of 11 U.S.C. § 506(a), the collateral described in the first section of the Plan at the lesser of the value stated in the Final Plan or the amount claimed on the creditor's proof of claim. The Plan also provided that allowed secured claims would be paid 10% interest after confirmation, except that any allowed claim that was fully secured would be paid interest from the date the Debtors filed their bankruptcy petition. No objections were filed and the bankruptcy court entered an order in June 1994 confirming the plan and approving the valuations set forth in it ("the Confirmation Order"). Neither the Fi-

nal Plan nor the Confirmation Order made any reference to the Stay Order or included any default provisions similar to those contained in the Stay Order.

In October 1995, the Trustee filed a motion to dismiss the Third Case as a result of the Debtors' failure to make payments as required by the Final Plan. Apparently the Trustee then prepared, and certainly Ms. Diviney approved, an "Interlocutory Order" that required the Debtors to cure all arrears by June 14, 1996, and provided for the case to be dismissed in the event the Debtors missed one payment for which they gave no explanation satisfactory to the Trustee. According to the Trustee's records, after confirmation, the Trustee paid the Bank about $1,760 (the $3,000 value of the Car minus the $1,240 in pre-confirmation payments) plus $184.66 in interest, bringing the total paid to the Bank during the case to $3,184.66. The bankruptcy court found the Bank's allowed secured claim had been paid in full pursuant to the Final Plan on or before August 9, 1996. Our review of the Trustee's records indicates the Bank had actually been paid the $3,184.66 by January 1996.

The Debtors moved to Tulsa, Oklahoma, in January 1996. On June 27, 1996, the bankruptcy court entered an order ("the Dismissal Order") dismissing the Third Case pursuant to the interlocutory order. For some reason not revealed in the record, the Dismissal Order was not served on the Debtors or any other parties until July 8, 1996. Ms. Diviney testified that the Debtors never received the Dismissal Order but learned about it when a creditor contacted them seeking payment. The Debtors subsequently filed a motion to reinstate the case and transfer it to the Northern District of Oklahoma ("the Motion to Reinstate"). The Motion to Reinstate provided creditors twenty days from the date of service to object and notified them that a hearing would be held on August 26, 1996. Ms. Diviney attached to the Motion to Reinstate a certification that she had served the motion by mailing it to a number of parties in interest, including the Bank. She mailed it to the Bank at the correct post office box and city in North Carolina, but with an incorrect zip code. Ms. Diviney did not send the mo-

tion to Ms. Bassel, but testified at trial that she had been directly contacting a Bank employee since March 1996 and had been told to deal directly with the Bank's employees.

No objection was filed, and on the specified date, the Texas bankruptcy court held a hearing and ordered the case reinstated. Mr. Diviney traveled from Tulsa to Dallas to attend the hearing, but neither the Bank nor any other creditors appeared. The written order reinstating the case ("the Reinstatement Order"), signed the day of the hearing and entered the next day, reads as follows:

ORDER APPROVING MOTION TO REINSTATE CASE

After appearing before the Court this date, it is

ORDERED that the above referenced case be reinstated

ORDERED that a change of venue is approved for transfer to Tulsa, Oklahoma, to the Clerk of Bankruptcy Court.

The docket sheets for the Third Case from Texas and Oklahoma contain no indication that the Reinstatement Order was ever served on anyone.

On September 7, 1996, the Car was repossessed from the Debtor's home at the direction of the Bank. Five days later, the Bank sent a letter to Ms. Diviney informing her that the Car had been repossessed and that, unless the balance of $4,706.61 owed on her contract with the Bank plus repossession costs of $340 were paid, the Car would be sold after September 23. The Bank sold the Car later that month for $235. About two months after that, on November 27, an entity called "Credit Converters" sent Ms. Diviney a letter on the Bank's behalf seeking payment of $4,861.71 that the Bank claimed she still owed it. There was no evidence of any further collection activities by the Bank. The Debtors, now represented by counsel, filed an adversary complaint alleging that the Bank had violated the automatic stay.

At trial, Ms. Diviney testified that she received a copy of the Reinstatement Order on September 3, 1996, and immediately thereafter mailed a copy to all parties in interest. She had prepared a certificate of service for the Reinstatement Order showing

that, like the Motion to Reinstate, she served it on the Bank at the correct post office box, city, and state, but with an incorrect zip code. She testified that she mailed this certificate of service to the Texas bankruptcy court, but neither the Texas nor Oklahoma docket sheets show it to have been filed. Ms. Diviney testified that on the first business day after the Car was repossessed, she called and spoke with an employee of the Bank named Shelly Marshall, informing her that the Third Case had been reinstated and that the Bank was subject to the automatic stay and must return the Car. Ms. Diviney said Ms. Marshall acknowledged having received the Motion to Reinstate, but indicated she had not received a copy of the Reinstatement Order. Ms. Marshall then put Ms. Diviney on hold while she called the clerk of the bankruptcy court in Texas to confirm that the Third Case had been reinstated. When their conversation resumed, Ms. Diviney testified, Ms. Marshall said that she had confirmed the reinstatement and that the Bank had "made a mistake" in repossessing the Car. Nevertheless, citing the insurance provision in the Stay Order, she indicated the Car would not be returned to the Debtors unless they provided proof of insurance to the Bank. She may have indicated the Debtors would have to pay the Bank more money as well. Certainly, the Bank's employees later insisted the Debtors owed more money.

Mr. Diviney testified that he had over twenty calls with representatives of the Bank after repossession of the Car. According to Mr. Diviney, Ms. Marshall advised him that the situation was no longer a bankruptcy matter. He then spoke to bankruptcy supervisor Bill Johnson, who, according to Mr. Diviney, stated that the Bank was owed more money and would not return the Car unless the Debtors provided proof of insurance. Mr. Johnson's deposition was read into the record and in it, he testified that he told Mr. Diviney that the Bank would return the Car once the Debtors provided proof of insurance. On cross-examination, however, he admitted the Bank would not have returned the Car until the Debtors made arrangements to pay the Bank the remaining balance it claimed was due.

Mr. Johnson testified that to the best of his knowledge, the Debtors never informed him or anyone else at the Bank that the Third Case had been reinstated. The Debtors testified that they informed the Bank of the reinstatement of their case on numerous occasions. In the pretrial order, the Bank listed eight people in its bankruptcy department, including Ms. Marshall, whom the Debtors had "conferred with" about the repossession of the Car, but Mr. Johnson's was the only substantive testimony the Bank presented about any of the conversations the Bank's employees had with the Debtors. Steve Ferenchiak, a "coordinator" in the Bank's 110-person consumer bankruptcy department in North Carolina, testified about internal procedures for opening and routing mail, and processing bankruptcy cases. He also reported that Ms. Marshall had been on maternity leave since May and had recently given birth to a small, premature baby. The bankruptcy court indicated it had trouble believing the Bank had no record of its employees' conversations with the Debtors other than Ms. Marshall's memory.

Following the trial, the bankruptcy court issued a thorough and thoughtful opinion, including detailed findings of fact. It found that the Debtors had proven by clear and convincing evidence that the Bank had willfully violated the automatic stay. The Reinstatement Order, the court reasoned, had revived the Third Case so that it was pending when the Car was repossessed and sold. The court rejected the Bank's argument that the Reinstatement Order did not vacate the Dismissal Order, noting that there would be no case to reinstate and transfer unless the Dismissal Order was vacated. The court held that the Reinstatement Order resurrected the Final Plan and the Confirmation Order, and caused the terms of the automatic stay, 11 U.S.C. § 362(a), to apply. It could not be disputed, the court said, that in a Chapter 13 case, the automatic stay remains in effect during the pendency of the case, pursuant to § 362(c)(2), until a discharge is granted or denied, and in the Debtors' case, the automatic stay was reimposed by the entry of the Reinstatement Order. The repossession and sale of the Car subsequent to the Reinstatement Order constituted acts to

obtain possession of property of the estate and to enforce the Bank's claimed lien against property of the estate.

The Bank argued that its actions were authorized by the Stay Order, but the bankruptcy court ruled that after the Confirmation Order was entered, the Final Plan, not the Stay Order, governed the rights of the parties. Under § 1327(a), the court held, the confirmed plan becomes the operative document governing the rights, remedies, and obligations of the debtor and the creditors, and supersedes all previous orders entered in the case that are not expressly preserved. The Debtors' Final Plan provided that the Bank had an allowed secured claim of $3,000 that would be paid over 36 months with interest at the rate of ten percent per annum. Since neither the Final Plan nor the Confirmation Order made any mention of the Stay Order, the court ruled that the Stay Order did not survive confirmation and the Bank could not rely on its provisions.

The Bank also argued that it did not have sufficient notice of the Reinstatement Order because the veracity of Ms. Diviney's certificate of service was doubtful and in any event, the certificate indicated that Ms. Diviney used the wrong zip code in serving the Reinstatement Order on the Bank and did not send it to Ms. Bassel. The court declared it believed Ms. Diviney had mailed the Order as stated in her certificate of service. It also pointed out that Ms. Diviney had addressed the Motion to Reinstate and the Reinstatement Order the same way, and she testified that Ms. Marshall had acknowledged receipt of the Motion. Because the court believed the Debtors' claims that they had told many Bank employees about the reinstatement during numerous phone calls, the court concluded the failure to serve Ms. Bassel and the other mailing defects became "largely irrelevant in light of the actual notice which the Bank received." The court found Mr. Johnson's testimony that the Debtors did not mention the reinstatement to be neither substantial nor credible, and concluded it was impossible for the court to find that the Bank did not have notice of the reinstatement before it sold the Car.

Having determined the Bank's conduct violated the automatic stay, the bankruptcy court then determined that the conduct was willful. The court quoted the Tenth Circuit's definition of "willful" in *C.I.T. Fin. Servs. Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir.1989), a case under § 523(a)(6), and concluded the *Posta* definition also applied under § 362(h). The court found that the Bank knew no later than September 9, 1996, that the Third Case had been reinstated and that the Debtors were claiming the protections of the automatic stay, and that the Bank had undertaken its own independent investigation to determine that the Third Case had been reinstated. For whatever reason, the court said, the Bank refused to return and ultimately sold the Car, and also knowingly, intentionally, and voluntarily informed the Debtors that it would not return the Car unless it was paid additional monies in violation of the Final Plan. These actions, the court concluded, violated the automatic stay. The court rejected the Bank's defense that the Reinstatement Order did not give it sufficient notice that the automatic stay had been reinstated, pointing out that the Bank is a large, sophisticated creditor that knew or should have known that reinstatement of the case also reinstated the automatic stay, and knew or should have known that the bankruptcy court, not the Bank, determines the applicability and effect of the stay in a given case.

The bankruptcy court found that the Debtors had suffered actual damages of $2,850 from the loss of the Car and a loss of wages because Mr. Diviney was unable to work at his pizza delivery job for two weeks after the repossession. The court indicated it would award attorney fees to the Debtors as well, and directed counsel to submit a written statement of his fees and expenses. The court also determined that punitive damages were justified in this case because the Bank had acted with "reckless disregard" of the provisions of the automatic stay by selling the Car and trying to collect a deficiency it was not entitled to recover under the terms of the Final Plan without first seeking a court ruling. The court determined that an award of $40,000 was appropriate and would serve to deter the Bank, and any other credi-

tors similarly situated in the future, from unilaterally determining the scope and effect of the automatic stay; to prevent any possible offset of this sanction, the court also barred the Bank from receiving any further distributions that might otherwise be made to it under any amendments to the Final Plan. Debtor's counsel thereafter submitted a statement of his fees and the Bank objected to them, but the parties reached a settlement, without waiving any appeal rights, that the court should allow costs and attorney fees totaling $15,000. The court accepted this agreement without independently reviewing counsel's fee request, and gave the Debtors judgment for a total of $57,850. The Bank does not complain about the amount of the costs and fees in this appeal.

## II. Jurisdiction and Standard of Review.

A Bankruptcy Appellate Panel, with the consent of the parties, has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges in this circuit. 28 U.S.C. § 158(a), (b)(1), (c)(1). As neither party has opted to have this appeal heard by the District Court for the Northern District of Oklahoma, they are deemed to have consented to jurisdiction. 10th Cir. BAP L.R. 8001–1(d).

In reviewing an order of the bankruptcy court, an appellate court "reviews the factual determinations of the bankruptcy court under the clearly erroneous standard, and reviews the bankruptcy court's construction of [a statute] de novo." *Taylor v. IRS,* 69 F.3d 411, 415 (10th Cir.1995) (citations omitted).

A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). "It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972).

*Gillman v. Scientific Research Prods. (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555 (10th Cir.1995).

"Whether a party's actions have violated the automatic stay is a question of law which is reviewed *de novo.*" *Barnett v. Edwards (In re Edwards),* 214 B.R. 613, 618 (9th Cir. BAP 1997) (citations omitted). We review the bankruptcy court's finding that a creditor's action constituted a willful violation of the stay for clear error. *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165, 167 (9th Cir. BAP 1995); *Franchise Tax Bd. v. Roberts (In re Roberts),* 175 B.R. 339, 343 (9th Cir. BAP 1994). An award of sanctions for a violation of the automatic stay is reviewed for an abuse of discretion. *Edwards,* 214 B.R. at 618.

Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. When we apply the "abuse of discretion" standard, we defer to the trial court's judgment because of its first-hand ability to view the witness or evidence and assess credibility and probative value.

*United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986); *see also Moothart v. Bell,* 21 F.3d 1499, 1504 (10th Cir.1994) (quoting and applying this standard); *McEwen v. City of Norman,* 926 F.2d 1539, 1553–54 (10th Cir.1991) (same). An abuse of discretion may occur if a court bases its ruling on a view of the law that is erroneous. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

## III. Discussion.

### A. Violation of the Automatic Stay.

As indicated, whether the Bank violated the automatic stay is a question of law that we review *de novo.* Section 362(a) of the Bankruptcy Code establishes the automatic stay and provides that the filing of a bankruptcy petition operates as a stay of, among other things: "(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over

property of the estate; [and] (4) any act to create, perfect, or enforce any lien against property of the estate." The Bank offers four reasons why it did not violate the stay by repossessing and selling the Debtors' Car, and trying to collect money not due to it under the Final Plan: (1) the Dismissal Order terminated the stay and the Reinstatement Order did not reimpose it; (2) the Stay Order expressly stated it would last so long as the Debtors' bankruptcy case was pending and the Debtors' failure to maintain insurance on the Car that listed the Bank as a loss payee constituted a default under that Order, terminating the stay as to the Bank and authorizing the Bank to proceed against the Car; (3) like the Bank, the Debtors treated the Stay Order as still in effect even following confirmation of the Final Plan; and (4) because the Debtors never objected to it, the Bank's proof of claim was deemed allowed as a fully secured claim pursuant to § 502(a). We will consider these reasons in turn.

■ The Bank correctly asserts that the automatic stay terminated pursuant to § 362(c) when the Dismissal Order was entered and that the Reinstatement Order did not expressly reimpose the stay. It then cites two United States Tax Court cases holding that an order vacating an order that had terminated the automatic stay only through the operation of § 362(c) does not reimpose the stay absent an express order doing so. *Guerra v. Commissioner*, 110 T.C. 271, 1998 WL 161009 (1998) (order dismissing case); *Kieu v. Commissioner*, 105 T.C. 387, 1995 WL 729408 (1995) (order denying discharge). Thus, although the order that effectively terminated the stay did not do so expressly, the Tax Court ruled a later order vacating that order could not reimpose the stay without doing so expressly, a result that seems quite odd. We would have thought that the more expected result of vacating an order should be to vacate all its effects as well. The Bank also rightly asserts that the bankruptcy court held that the Reinstatement Order had impliedly reimposed the automatic stay, but we cannot agree with the Bank and the Tax Court that this should not be a necessary implication of that Order. Indeed, without the protection of the automatic stay, the Debtors' ability to comply

with their Final Plan would have been in constant jeopardy since their creditors would have been free to seize collateral, as the Bank did, or to obtain and execute on judgments, seizing any nonexempt property the Debtors might have, including in most states some portion of their wages. After confirmation of a Chapter 13 plan, the stay not only protects a debtor's ability to comply with the plan, but also protects the plan's provisions for the distribution of the debtor's plan payments and any other property to be distributed by precluding creditors from obtaining forced payments ahead of creditors with claims of equal or greater priority.

Furthermore, the Bank does not dispute that the automatic stay was in effect before the Dismissal Order was entered, and the leading legal dictionary defines "Reinstate a case" as "To place case again in same position as before dismissal." *Black's Law Dictionary* 1157 (5th ed.1979). If the automatic stay had not been reinstated along with the Third Case, the case would not have been returned to its pre-dismissal position. At least one bankruptcy court has ruled that the automatic stay must be automatically reimposed when a dismissed Chapter 13 case is reinstated. *In re Nail*, 195 B.R. 922, 925–26 & 931–32 (Bankr.N.D.Ala.1996). In another case, even the creditor seems to have assumed such a reinstatement reimposed the stay. *In re Bennett*, 135 B.R. 72 (Bankr. S.D.Ohio 1992) (without discussing whether reinstatement reimposed stay, court sanctioned creditor under § 362(h) for violating stay after case was reinstated). By contrast, reopening a Chapter 7 case after a discharge has been granted and the case has been closed is different from reinstating a Chapter 13 case, and courts have held the stay is not automatically reimposed in that situation, especially for matters unrelated to the purpose of reopening the case. *Burke v. United States (In re Burke)*, 198 B.R. 412, 416 (Bankr.S.D.Ga.1996) (reopening simply did not reimpose stay); *In re Trevino*, 78 B.R. 29, 32–33 & 37–38 (Bankr.M.D.Pa.1987) (creditor's foreclosure on debtor's residence not stayed by reopening case for Chapter 7 trustee to review unrelated lawsuit debtor had filed against same creditor while case

was in Chapter 11). We hold that reinstatement of the Third Case restored the automatic stay as of August 26, 1996, so the stay was in effect on September 7, 1996, when the Bank repossessed the Car.

 The Bank next argues that because the Stay Order required the Debtors to maintain insurance on the Car with the Bank as loss payee "throughout the pendency of this bankruptcy proceeding," that Order remained in force after confirmation of the Final Plan and governed the rights of the parties. This argument is also without merit. Section 1327(a) provides: "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a). Under this section, unless expressly preserved in the plan or the order confirming the plan, all pre-confirmation agreements and orders concerning the treatment of a claim are superseded by the terms and provisions of the confirmed plan. *Green Tree Fin. Corp. v. Garrett (In re Garrett)*, 185 B.R. 620, 623 (Bankr.N.D.Ala.1995); *see also* 2 Keith M. Lundin, *Chapter 13 Bankruptcy* § 6.9 (2d ed.1994) (discussing binding effect of confirmation and citing many cases about it). In this case, neither the Final Plan nor the Confirmation Order repeat, incorporate by reference, or even mention the Stay Order or any of its provisions. For whatever reason, the Bank, which was represented by counsel, did not seek to incorporate the provisions of the Stay Order into the Final Plan or Confirmation Order, and as a result, the Bank may not rely upon them as authorization for its actions.

 The Bank also asserts that the Stay Order survived confirmation because the Debtors thereafter treated the order as still in effect. We have reviewed the Bank's pretrial motion for partial summary judgment, the pretrial order, and the Bank's closing brief, and can find no mention of this argument before the bankruptcy court. Issues not raised before the trial court will not ordinarily be considered when raised for the first time on appeal. *Novell, Inc., v. Federal Ins. Co.*, 141 F.3d 983, 990 (10th Cir.1998) (appellate court under no obligation to consider argument raised for first time on appeal). It is especially appropriate to apply this general rule here because our review of the record indicates that if the trial court had faced this argument, it could easily have found that the Debtors did not treat the Stay Order as in effect after confirmation, but asked if the Bank had complied with the Order only in response to the Bank's assertion that they must prove they were complying with its provisions before the Car would be returned. Even if the court would have found the Debtors had treated the Stay Order as still in effect, it might easily have felt their mistake should be excused because they were proceeding *pro se*. While Ms. Diviney had worked as a legal secretary and a paralegal, she was not an attorney and would not likely be held to the standards of knowledge that attorneys must meet.

 The Bank's final argument for the continued enforceability of the Stay Order after confirmation of the Debtors' Final Plan is confusing, but appears to be suggesting that the Bank's claim was deemed allowed as fully secured because the Debtors never objected to the proof of claim the Bank filed and that this alleged fact somehow made the Stay Order remain in effect. This argument is singularly unconvincing. First, we can see no logical connection between the amount of the Bank's secured claim and the question whether the Stay Order survived confirmation of the Final Plan. Even if we assume for the sake of argument that the Bank's claim survived confirmation as fully secured and that the Bank had a lien for the balance of its claim over the $3,000 plus interest paid through the Final Plan, the fact remains that, unless the Stay Order remained in effect, the Bank would have violated the automatic stay by enforcing that lien after the Reinstatement Order, as we have held it did, reimposed the automatic stay.

We also find it difficult to interpret the Bank's proof of claim as having asserted that the Bank was fully secured. At best, the proof is ambiguous. It states in one place that the claim is secured but in another that it is secured only to the extent the Bank's security interest in the Car is sufficient to

satisfy the claim. The full amount of the claim is inserted in the "payoff balance" space at the bottom of a column labeled "secured" and the corresponding space at the bottom of the column labeled "unsecured" is left blank, but just below that, another space for stating the value of the collateral is also left blank. We are not convinced the bankruptcy court was required to interpret this proof to identify the Bank's claim as being fully secured.

We think that the Bank misunderstands how the Debtors treated its claim. Although they might properly have objected to the allowance of any unsecured portion of the claim due to the Chapter 7 discharge they received in the First Case, they did not. Instead, they listed the claim in their Final Plan at the full amount shown on the proof of claim, stated their view of the value of the Car, and asked the Court, pursuant to § 506(a) and Federal Rule of Bankruptcy Procedure 3012, to value the Car and thus fix the amount of the Bank's allowed secured claim for purposes of the Plan. The balance of the Bank's claim was, like other general unsecured claims, simply to be paid nothing.

The Bank suggests that two Fifth Circuit decisions would be applicable because the Third Case was still pending in Texas when the Final Plan was confirmed, and contends those cases hold that a creditor's proof of a secured claim is deemed allowed under § 502(a) as a secured claim unless a party in interest objects to it and that a secured claim thus deemed allowed cannot be altered by a provision in a Chapter 13 plan in the absence of such an objection. *Sun Fin. Co. v. Howard (In re Howard)*, 972 F.2d 639 (5th Cir. 1992); *Simmons v. Savell (In re Simmons)*, 765 F.2d 547 (5th Cir.1985). The Tenth Circuit, by contrast, has ruled that a Chapter 11 plan provision could extinguish creditors' security interests so long as the creditors had adequate notice that would be a result of confirmation of the plan. *American Bank and Trust Co. v. Jardine Ins. Servs. Texas, Inc. (In re Barton Indus., Inc.)*, 104 F.3d 1241, 1245 (10th Cir.1997). This Court later relied on *Barton* in holding that confirmation of a Chapter 13 plan constituted a binding determination of dischargeability under

§ 523(a)(8) when the plan provided that confirmation of the plan would constitute a finding to the effect that excepting from discharge the portion of student loan debts that would not be paid through the plan would impose an undue hardship on the debtor and the debtor's dependents. *Andersen v. Higher Educ. Assistance Found. (In re Andersen)*, 215 B.R. 792, 794–95 (10th Cir. BAP 1998). In light of the transfer of the Third Case from a bankruptcy court in the Fifth Circuit to one in the Tenth Circuit, this conflicting authority might cause us difficulty if we agreed with the Bank that *Simmons* and *Howard* precluded confirmation of the Final Plan from establishing the amount of the Bank's allowed secured claim to be $3,000. Fortunately, we do not agree.

In *Simmons*, the debtor's plan had simply classified a creditor's claim as unsecured despite the creditor's properly perfected statutory construction lien. 765 F.2d at 549. In *Howard*, the debtors' plan provided that a creditor would be paid a portion of its secured debt but the balance of that debt would be set off against the debtors' claim against the creditor for unfair and deceptive trade practices, and the creditor's lien would then be lifted. 972 F.2d at 640. The Fifth Circuit referred to Federal Rule of Bankruptcy Procedure 3007 in holding that the results these debtors sought could only be obtained by filing an objection to the creditors' proofs of claim. *See* 765 F.2d at 552, 972 F.2d at 640. Relying on some broad language in the opinions that seems to suggest valuation of a secured creditor's collateral must also be sought by an objection under Rule 3007, the Bank in effect argues that a motion for valuation, like a plan provision, is in the Fifth Circuit's view ineffective to obtain a binding determination of value. However, in *IRS v. Taylor (In re Taylor)*, 132 F.3d 256, 261–63 (5th Cir.1998), the Fifth Circuit recently held that the *Simmons–Howard* rule applied to a nondischargeable tax debt in a Chapter 11 case, but that the appropriate vehicle for the debtor to obtain a binding determination about his liability for the debt would have been a motion under § 505 of the Bankruptcy Code rather than the provisions he had included in his plan. Significantly, the court specifically declared that it was not ruling

that a bankruptcy court must hold a distinct hearing to determine a tax debt or could not combine a § 505 hearing with a confirmation hearing, but only that confirmation alone does not invoke the tax determination process. 132 F.3d at 263.

The motion for valuation the Debtors included in their Final Plan indicated it was filed pursuant to Federal Rule of Bankruptcy Procedure 3012 and 11 U.S.C. § 506(a). Rule 3012 provides:

> The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

The Bank argues, in effect, that the motion for valuation was, like the Final Plan and Confirmation Order, an invalid attempt to split its claim into secured and unsecured parts, an argument that depends on language in *Simmons* and *Howard* indicating the only way to affect a secured claim is to object to it. Neither case involved a mere valuation, though, so the Fifth Circuit had no reason to look at Rule 3012 and did not mention it. We are convinced the Fifth Circuit would have recognized the propriety of a motion for valuation under Rule 3012 had that question been involved in either case, just as it recognized in *Taylor* the propriety of a motion to determine tax debt under § 505. In short, to the extent that the continued vitality of the Stay Order could have depended, as the Bank contends it did, on the Debtors' failure to object to the Bank's proof of claim, under the *Simmons–Howard* view of the plan confirmation process, the motion for valuation was an adequate substitute for such an objection.

The Bank also includes in this portion of its brief an assertion that the bankruptcy court's finding that the Bank's allowed se-

cured claim had been paid in full under the Final Plan was erroneous. The Bank correctly points out that the payment of $3,000 plus 10% interest over three years would require total payments exceeding the $3,184.66 paid to the Bank. However, the Trustee's records show that the Trustee paid the Bank about $1,240 before confirmation, presumably pursuant to the Stay Order, and then paid the balance of about $1,760 plus 10% interest from June 1994, when confirmation occurred, to January 1996, a period of about 19 months. While the Final Plan calls for fully secured claims to be paid interest from the date of the bankruptcy petition, the Bank's claim was not fully secured. Instead, it was paid pursuant to the provision in the Final Plan to split partially secured claims into secured and unsecured parts and to pay interest on the secured part only after confirmation. Since the Bank's argument here is based on a factually incorrect premise of how its allowed secured claim was to be paid, the Bank has not shown that the bankruptcy court's finding that the Bank was paid in full on that claim was erroneous.

For these reasons, we reject all the Bank's arguments asserting that the bankruptcy court erred in concluding the Bank had violated the automatic stay.[1]

## B. Willful violation of automatic stay.

 Having determined that the automatic stay was in effect upon reinstatement and that the conduct of the Bank violated the automatic stay, we must next consider whether the Bank's conduct was "willful" under 11 U.S.C. § 362(h). That provision reads: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Bank argues that its conduct was not willful because it did not have sufficient no-

1. We note in passing that the Bank does not argue it was not aware that the Reinstatement Order reinstated the Final Plan and the Confirmation Order. Even if the automatic stay had not been reinstated, the Bank violated the reinstated Confirmation Order by retaining the Car and seeking additional money when it had already been paid all it was entitled to receive

under the Final Plan. It also violated the injunction imposed by § 524(a) when the Debtors received a discharge in the First Case by trying to collect a deficiency from them after it sold the Car. We will not pursue these matters further, however, since the bankruptcy court expressly limited its decision to the provisions of § 362.

tice of the reimposition of the stay. We must affirm the bankruptcy court's factual finding that the Bank's conduct was willful unless we conclude the finding was clearly erroneous.

The Tenth Circuit has not defined "willful" as it is used in § 362(h). Many courts have adopted the definition enunciated by the court in *INSLAW, Inc., v. United States (In re INSLAW, Inc.)*, 83 B.R. 89 (Bankr.D.D.C. 1988):

> A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

83 B.R. at 165. *See, e.g., Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir. 1989); *Cuffee v. Atlantic Bus. and Community Dev. Corp. (In re Atlantic Bus. and Community Corp.)*, 901 F.2d 325, 329 (3rd Cir.1990). In the context of determining whether a debt is nondischargeable under § 523(a)(6) as arising from a "willful and malicious injury," the Tenth Circuit construed "willful" to mean conduct that was "volitional and deliberate" and over which a debtor exercised meaningful control, as opposed to unintentional or accidental conduct. *C.I.T. Fin. Servs., Inc., v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir.1989). While the Supreme Court's recent decision in *Kawaauhau v. Geiger*, —— U.S. ——, —— –——, 118 S.Ct. 974, 977–78, 140 L.Ed.2d 90 (1998), rejected the Tenth Circuit's interpretation of § 523(a)(6), *see Berger v. Buck (In re Buck)*, 220 B.R. 999, 1004 (10th Cir. BAP 1998), we believe the *Posta* definition accords with that offered in *INSLAW* and indicates the Tenth Circuit would approve the *INSLAW* approach to willfulness under § 362(h). We think the narrower *Geiger* standard should not be applied to § 362(h) because a party who willfully violates the automatic stay had the opportunity to seek permission from the bankruptcy court before taking actions that might violate the automatic stay, while determinations of "willful and malicious injury" under § 523(a)(6) are made only after the debtor has acted without the opportunity to obtain a protective ruling from a court before acting.

The Bank argues its conduct was not willful because it did not have adequate notice that the Third Case had been reinstated and that the automatic stay was again applicable. We first note that the bankruptcy court did not find the Bank had notice of the reinstatement of the case and possible applicability of the stay before it repossessed the Car, but only that it received such notice when Ms. Diviney called it on the first business day after the repossession. Consequently, the court found that the Bank's failure to return the Car at that time or at least to seek a court ruling on the applicability of the stay, not its repossession of the Car, rendered its conduct willful.

■ The Bank suggests the bankruptcy court could not find that it had received the Reinstatement Order because Ms. Diviney used the wrong zip code when she mailed a copy to the Bank. But, as the bankruptcy court pointed out, Ms. Diviney testified that Ms. Marshall admitted she had received the Motion to Reinstate that had been addressed the same way. This evidence was sufficient to permit the court to find that the Bank had received a copy of the Reinstatement Order. The Bank also seems to suggest this attempted notice was insufficient even if it did arrive at the Bank because Ms. Diviney failed to serve another copy on the attorney who had represented the Bank in obtaining the agreed Stay Order two years and eight months before the Debtors filed their Motion to Reinstate. Ms. Diviney testified that she had been in direct contact with Ms. Marshall since March 1996, and had been told to deal directly with the Bank's employees. Thus, the evidence permitted the bankruptcy court to find that Ms. Diviney had given the Bank adequate notice of the Reinstatement Order. We cannot know, however, what the bankruptcy court's ultimate decision would have been had this written notice been the only notice the Bank had about the reinstatement of the Third Case. Instead, the court ultimately found that the Debtors' telephone

contacts with a number of the Bank's employees overrode any deficiencies in the written notice to the Bank, and gave the Bank actual notice of the reinstatement and the Debtors' claim the automatic stay was again in effect.

The Bank also attacks the sufficiency of the Debtors' testimony about these telephone contacts to support the court's finding of actual notice. It suggests the Debtors' testimony was not credible in light of the Bank's assertion that it did not receive the Reinstatement Order and Mr. Johnson's testimony that the Debtors never mentioned the reinstatement to him or any of the Bank's other employees. This conflict in the evidence, of course, required the bankruptcy court to make a credibility determination, and its finding could not have been clearly erroneous no matter which witnesses it chose to believe. We would note, however, that the Bank conceded in the pretrial order that eight of its employees had "conferred with" the Debtors about the repossession of their Car, but presented the testimony of only one of those eight at trial, and that the Bank offered no business records of any of those conversations. The court was free to infer that the Bank chose not to present such potential evidence, clearly available to it, because the evidence would have harmed the Bank's position. In addition, Mr. Johnson admitted he knew about the Stay Order and the Dismissal Order that had been entered in the Third Case, and said he had told the Debtors they would have to comply with provisions in the Stay Order to get their Car back. Yet he asked the court to believe the Debtors never mentioned to him that the Reinstatement Order had been entered. We do not find it surprising that the court found the Bank's limited evidence that the Debtors had not informed its employees that the Third Case had been reinstated was "neither substantial nor credible." Instead, the court accepted the Debtors' assertions that they had told the Bank's employees the Third Case had been reinstated and the Car had been repossessed in violation of the stay, and that Ms. Marshall had contacted the Texas bankruptcy court and confirmed that the case had been reinstated. The court described the Debtors' statements to the Bank's employees as having been "loud, long and sometimes profane," making it "impossible" for the court to find that the Bank did not have notice of the reinstatement before it sold the Car.

Although the Bank asserts its relevance, Mr. Reagan's testimony that the Debtors did not tell him about the Reinstatement Order added little to the Bank's evidence on this point. The Debtors had been told that the Bank had hired Mr. Reagan's business to repossess the Car, and they went to his business only to recover personal items that had been in the Car when it was repossessed. The Debtors would have had no reason to think Mr. Reagan could help them convince the Bank to return the Car to them.

The Bank seems to be arguing that even the oral notice the bankruptcy court found the Debtors had given cannot support a finding of a "willful violation" of the automatic stay. It cites *In re Wrobel,* 197 B.R. 289 (Bankr.N.D.Ill.1996), a decision involving a claimed stay violation, to support this claim, but has misunderstood the decision in several ways. First, the Bank says the debtor in that case had told an attorney creditor in a conversation that she had "filed a Chapter 13 case in an attempt to save her home." Appellant's Brief in Chief at 35. In fact, the statement was a written one contained in a pleading filed in a state court proceeding. 197 B.R. at 292 (the word "case" does not appear in the quotation in the court's decision). The bankruptcy court, as the finder of fact, declared this statement to be ambiguous since the debtor had filed two Chapter 13 cases, only the second of which was relevant. *Id.* at 294 n. 5. The creditor denied having any knowledge of the second Chapter 13, and the court concluded the debtor failed to prove the creditor had such knowledge. *Id.* at 292–93 & 294 n. 5. The court was not convinced by the debtor's testimony that she had seen a copy of the second Chapter 13 petition in the creditor's possession because she could not explain how she knew it was that petition rather than the first one or some related documents. *Id.* at 292 & 294 n. 5.

The cited portions of the *Wrobel* decision simply explain some of the court's findings of fact. The opinion does not begin to suggest the Bank's proffered rule of law that the Debtors' testimony that they gave the bank oral notice of the reinstatement and the automatic stay cannot constitute clear and convincing evidence that the Bank had actual notice of the reinstatement and possible applicability of the stay. Nor was there evidence in this case that any of the Bank's employees had heard the Debtors' claims that their case had been reinstated but thought they were referring to the Second Case, which had been dismissed in 1993, rather than the Third Case, the one dismissed in 1996. In fact, all the evidence indicated not only that the Bank's employees were aware of the Third Case, but also that they insisted the Debtors had to comply with the Stay Order, entered in the Third Case, not the Second, before the Bank would return the Car to them. The facts in this case simply do not disclose any ambiguity in the Debtors' statements to the Bank's employees about which of their bankruptcy cases had been reinstated, or any possibility the Bank's employees were not aware of the Third Case.

■ We do not believe the bankruptcy court found the Bank's repossession of the Car to have been a willful violation of the automatic stay, but only its subsequent actions—after the Debtors had told it of the reinstatement and their claim of stay protection—of refusing to return the Car to the Debtors and instead selling it, and trying to collect money not due to the Bank. Many courts have held that an innocent stay violation can become willful if the creditor fails to remedy the violation after receiving notice of the stay. *See, e.g., Taborski v. United States,* 141 B.R. 959, 966 (N.D.Ill.1992); *Stmima Corp. v. Carrigg (In re Carrigg),* 216 B.R. 303, 304–05 (1st Cir. BAP 1998); *Abrams v. Southwest Leasing and Rental Inc. (In re Abrams),* 127 B.R. 239, 241–44 (9th Cir. BAP 1991). We agree. As the bankruptcy court noted, the Bank is a large, sophisticated creditor with over 100 people in its bankruptcy department alone, and knew or should have known that reinstatement of a Chapter 13 case reinstates the automatic stay. At the least, the Debtors notified the Bank that they believed the repossession had violated the stay, and the Bank knew or should have known that the bankruptcy court was available to decide whether the stay applied and the Bank had to return the Car. With knowledge of the reinstatement and the Debtors' claim to protection under the automatic stay, and without seeking a ruling from the bankruptcy court, the Bank intentionally refused to return and ultimately sold the Car, and also knowingly, intentionally, and voluntarily demanded additional sums from the Debtors, going so far as to hire a collection agency to try to recoup a deficiency even though the Bank had been paid all it was entitled to receive under the Final Plan and Confirmation Order. The bankruptcy court's finding of willfulness is amply supported by the record and is not clearly erroneous.

## C. Punitive damages.

■ The Bank next argues that the award of punitive damages was both erroneous and excessive, but does not appeal the amount of actual damages awarded, $2,850 plus $15,000 in attorney fees and costs. In holding this case involved "appropriate circumstances" for an award of punitive damages under § 362(h), the bankruptcy court considered two standards other courts have formulated for making that determination. The Bank accepts the propriety of these standards and contests only the court's application of them to the facts of this case. Seeing nothing clearly amiss about them, we likewise accept the propriety of the standards for purposes of this appeal.

The first standard the court applied indicates that the debtor may recover punitive damages when the defendant acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so. *Fry v. Today's Homes, Inc. (In re Fry),* 122 B.R. 427, 431 (Bankr.N.D.Okla.1990) (citing *In re Wagner,* 74 B.R. 898 (Bankr.E.D.Pa.1987)). The court found this standard was met because the Bank had knowledge the Third Case had been reinstated, but proceeded to make a conscious decision to sell the Car and to try to collect a deficiency it was not entitled to under the terms of the Final Plan,

despite having ample opportunity to investigate to ensure that its conduct was permissible and to seek the bankruptcy court's ruling on that question.

The second standard the court considered specifies four factors to review in determining whether punitive damages should be awarded under § 362(h): (1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the motives of the defendant; and (4) any provocation by the debtor. *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 487–488 (E.D.Pa.1989); *accord In re Sumpter*, 171 B.R. 835, 845 (Bankr. N.D.Ill.1994); *Nigro v. Oxford Dev. Co. (In re M.J. Shoearama, Inc.)*, 137 B.R. 182, 190 (Bankr.W.D.Pa.1992). The court found that punitive damages were also justified under this test, stating that there can be no more clear and direct violation of the automatic stay than taking property of the estate and refusing to return it. The court declared the Bank held the Car "hostage" under the guise of requiring proof of insurance but in reality in an attempt to collect more money than it was entitled to, and declined to find that any of the Debtors' actions had provoked the Bank's willful stay violation. The court had little concern about the Bank's ability to pay the damages assessed against it. The Bank suggests the bankruptcy court did not give adequate weight to some of the evidence before it, but we cannot conclude the court abused its discretion in deciding that punitive damages were appropriate. We find that the Bank's conduct was precisely the type of conduct that authorizes a bankruptcy court to award punitive damages under § 362(h).

The Bank also contends the amount of punitive damages awarded was excessive "in view of the relatively nominal damages actually sustained and proven by the Debtors." The Bank cites no authority involving appellate court review of a punitive damage award that is claimed to be excessive. We are aware of recent decisions that have imposed some limits on punitive damage awards under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, which applies only to the States, *see, e.g., BMW of North America, Inc., v. Gore*, 517 U.S. 559, 116 S.Ct. 1589,

134 L.Ed.2d 809 (1996); *FDIC v. Hamilton*, 122 F.3d 854, 861–62 (10th Cir.1997); *Continental Trend Resources, Inc., v. OXY USA Inc.*, 101 F.3d 634, 636–43 (10th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997), but assume those limits might also be applicable under § 362(h) through the Due Process Clause of the Fifth Amendment, which applies to the federal government. Nevertheless, we are convinced the bankruptcy court did not exceed those limits in this case.

In fixing the punitive damages at $40,000, the bankruptcy court expressed its intent that the award be sufficient to deter the Bank, and similarly situated creditors in the future, from unilaterally determining the scope and effect of the automatic stay. At that time, although it had not yet determined the amount of attorney fees to award to the Debtors, the court was satisfied that, once attorney fees were added, the Debtors' actual damages would exceed $4,000; the fees ultimately awarded brought the actual damages awarded to the Debtors to $17,850. The Bank effectively asks us to ignore the attorney fees in comparing the Debtors' actual damages to the punitive damages awarded. The Tenth Circuit has indicated, though, that the costs of litigation to vindicate rights may be considered in determining the constitutional limits on the size of a punitive damage award. *OXY USA*, 101 F.3d at 642. Consequently, we view the punitive damage award as constituting only about 2.25 times the Debtors' actual damages. Despite the Bank's failure to cite authorities limiting the size of punitive damages and fashion an argument based on them, we have considered the Tenth Circuit's decisions in *FDIC v. Hamilton* and *OXY USA*, and are convinced that the punitive damages awarded here are not excessive under the reasoning of either case.

The Bank did cite one case in support of its excessiveness argument, *In re Sumpter*, 171 B.R. 835 (Bankr.N.D.Ill.1994). In that case, the creditors, two private individuals, perhaps husband and wife, had properly terminated the debtor's and his co-buyers' rights under a contract for deed, evicted them from the house (in December), changed the locks, and moved most or all of their

personal property onto the front yard before the debtor filed for bankruptcy and gave them notice of the filing. *Id.* at 839–40. Representatives of the local village would not allow the debtor and his co-buyers to remove the personal property, apparently on the ground they would be trespassing if they went on the front yard. *Id.* at 841. The property remained outside all that winter night and then off-duty village employees, paid by the creditors, hauled the property to a storage facility. *Id.* at 841. The court found the debtor had failed to prove any dollar value of actual damage to his personal property, but awarded him $1,000 in attorney fees, court costs for which the debtor was to file a bill of costs, and $1,000 in punitive damages. *Id.* at 844–46. In fixing the punitive damages, the court noted the creditors were probably facing financial problems of their own as a result of the buyers' failure to make payments on the contract for deed. *Id.* at 845.

*Sumpter* does not convince us the punitive damages awarded here are excessive. The 2.25 to 1 ratio of punitive to actual damages here is not very different from the 1 to 1 ratio there. Perhaps more importantly, the stay violator here is a large financial institution that had over 100 employees in its bankruptcy department alone, not two private individuals perhaps suffering financial difficulties of their own. In addition, the *Sumpter* creditors' willful stay violation apparently lasted only about one day, while the Bank willfully violated the stay from September 9, when Ms. Diviney informed it the Third Case had been reinstated and she claimed to be protected by the stay, until November 27, when Credit Converters sent a collection letter to the Debtors. We believe the bankruptcy court was justified in making a larger punitive damage award here than was made in *Sumpter.*

Under the circumstances of this case, we are convinced the punitive damage award, although high, was not excessive.

### IV. Conclusion.

For these reasons, the bankruptcy court's order finding the Bank in willful violation of the automatic stay and awarding the Debtors actual damages, attorney fees, and punitive damages is hereby AFFIRMED.