**In re Barbara SMITH, Debtor.**

**Barbara Smith, Plaintiff,**

v.

**Homes Today, Inc., Steve Stutts, Royal Park Estates, and Richard Dale Massey, Defendants.**

**Bankruptcy No. 02–81180–WRS.**
**Adversary No. 02–8029–WRS.**

United States Bankruptcy Court, M.D. Alabama.

July 21, 2003.

Charles M. Ingrum Jr., Attorney at Law, Opelika, AL, for Plaintiff/Debtor.

Daniel W. Lee, Attorney at Law, La-Grange, GA, for Defendants Homes Today Inc. and Steve Stutts.

## MEMORANDUM DECISION

WILLIAM R. SAWYER, Chief Judge.

This Adversary Proceeding was tried before the Court, without a jury, on May 28, 2003. Plaintiff Barbara Smith ("Smith") was present in person and by counsel Charles M. Ingrum. Defendants Homes Today, Inc. ("Homes Today"), and Steve Stutts ("Stutts") were present by counsel Daniel W. Lee. At the time the case was called, the Plaintiff announced that a settlement had been reached with Defendants Royal Park Estates and Richard Dale Massey. The Court will, by separate order, dismiss those defendants. The Court heard evidence on the claims against the remaining defendants and took the matter under submission. The Court requested briefs from the parties on the legal issues. (Docs.24, 28). In accordance with Bankruptcy Rule 7052, the Court makes its findings of fact and conclusions of law. For the reasons set forth below, judgment is entered in favor of Plaintiff Barbara Smith and against Homes Today in the amount of $58,183.91, plus costs.

## I. FINDINGS OF FACT

Smith purchased her mobile home from Defendant Homes Today on September 24, 2001. (Plaintiff's Exhibit C). Defendant Stutts represented Homes Today and signed a Purchase Agreement on behalf of the corporation. (Plaintiff's Exhibit C). The contract appears to be on a preprinted form supplied by Homes Today. The contract calls for a sale price of $21,500.00. In addition, Homes Today charged sales taxes in the amount of $753.00, and a title application fee of $15.00. Smith paid $1,400.00 down, leaving an unpaid balance of $20,868.00. The contract called for payments of $300.00 per month for 180 months. In addition to the down payment, it appears that Smith paid at least an additional $1,050.00 towards the purchase price subsequent to the purchase. (Plaintiff's Exhibit D).

The Court notes that there is an inconsistency in the language of the contract as to whether or not the contract came into existence. The following preprinted language appears below the signature line for Homes Today: "approved, subject to acceptance of financing by bank or finance company." In typewritten language in the Remarks section of the contract, the following is stated: "Payments $300.00 per month for 180 months at 15.22% interest payment date starting on Nov. 15, 2001." As typewritten language applies over preprinted language, the Court finds that it was the intention of the parties that the balance of the purchase price was to be financed by Homes Today. *See e.g., McKinney Drilling Co. v. Collins Co., Inc.,* 517 F.Supp. 320, 324 (N.D.Ala.1981) (typewritten language takes priority over boilerplate provisions). The parties did not contemplate that Smith would borrow the purchase price from a bank or finance company. Therefore, the rights of the respective parties came into being as of the time the contract was executed.

The contract further provides that:

> title to said equipment shall remain in the Seller until the agreed purchase price therefore is paid in full in cash or by the execution of a Retail Installment Contract or a Security Agreement and its acceptance by a financing agency; thereupon title to the within described unit passes to the buyer as of the date of either full cash payment or the signing of said credit instruments even though the actual physical delivery may not be made until a later date. (Plaintiff's Exhibit C).

The language of this provision is vague for a number of reasons. First, Homes Today describes itself as a "dealer" in the

contract. The most logical construction of this provision is to infer that Homes Today is the seller as well as the dealer. This language implies that Homes Today holds title to the mobile home. Indeed, it would not be logical to assume that Smith would have agreed to pay Homes Today $21,500, unless Homes Today actually owned the mobile home and had the capability of transferring good title to her. The most logical construction of this contract is to find that Smith purchased the mobile home, financing the purchase price pursuant to the terms of the contract and that Homes Today, the seller, held title as security for payment of the balance of the purchase price.

A second problem is that in an earlier portion of the contract, the mobile home is referred to as "property," while in the language quoted above, it is referred to as "equipment." As the provision uses a word different than property, one might infer that something other than the mobile home is intended. Having heard the testimony of the Plaintiff and having considered the transaction as a whole, the Court finds that the terms "property" and "equipment" for purposes of the construction of this contract are synonymous. This construction further supports the Court's finding that Smith purchased the property and was its true owner, while Homes Today retained title as security for the purchase price.

The contract provided that the mobile home was to be delivered "ASAP." The exact date of delivery is not in the evidence, however, the Court infers from the testimony and other evidence that delivery took place a reasonably short time after execution of the contract. The mobile home was delivered to a lot rented by Smith in Royal Park Estates. (Plaintiff's Exhibit B); *see also* Transcript 5/28/2003, p. 18. On August 21, 2002, six days prior to the date the petition in bankruptcy was filed, Royal Park Estates served notice that Smith was in arrears on her rental payments for the lot in the amount of $1,100 and that if that amount was not paid by August 28, 2002, further legal action would be taken. The written notice contained the following provision: "Steve Stutts has our permission to move the house. He has notified us he plans to move the house next Wednesday August 28, 2002." (Plaintiff's Exhibit B).

Stutts argues that he was acting as an agent for Royal Park Estates at the time he repossessed the mobile home, pointing to the language of the August 21, 2002 notice. The Court rejects that contention. Rather, the Court finds that Smith purchased a mobile home from Homes Today, who retained title as security for the payment of the balance of the contract price. Smith rented a lot from Royal Park Estates and the mobile home was delivered by Homes Today to the lot. Apparently there was some communication between Homes Today and Royal Park Estates and the point of the handwritten language on the notice was to evidence the fact that Homes Today had permission to enter on to the land of Royal Park Estates to effect the repossession. Given the context of this Adversary Proceeding, Royal Park Estates was giving permission to Homes Today to enter onto its land. Royal Park Estates did not claim any interest in the mobile home.

On August 27, 2002, Smith filed a petition in bankruptcy, pursuant to Chapter 13 of the Bankruptcy Code. Under Chapter 13 of the Bankruptcy Code, a wage earner may file a plan which proposes to pay her debts over a period of time. *See* 11 U.S.C. § 1301, *et. seq.* The Debtor's Plan in this case proposes to maintain current payments on her mobile home and pay $50.00 per month on the delinquent amount owed.

In addition, the Plan provides that Royal Park Estates is to be paid its usual lot rental in the amount of $100.00 per month, with the payments to be made directly by Smith to Royal Park Estates. The Plan also provides for payment of an additional $40.00 per month to satisfy back rent which was to be paid by the Chapter 13 Trustee from plan payments made by the Debtor. (Doc. 2—main case).[1]

On August 28, 2002, Defendant Stutts and two unidentified men went to Smith's residence with a truck for the purpose of taking possession of it. Smith recognized Stutts and told him of her bankruptcy filing and showed him the bankruptcy papers. Stutts told Smith that it did not matter what was on the paper. *See* Transcript 5/28/2003, p. 24. Smith went into her residence in an effort to retrieve some belongings. Smith testified as follows:

> I continued, you know, to get my belongings out of the home and, while I was trying to get just clothes and whatever of value that I could get, the guy that actually drove the home came to the door and he said get out of the home, get out of the home now. We have orders to pull it now. I came to the front door, the steps were missing. The home was actually moving. I jumped out of a moving home.

Transcript, 5/28/2003, p. 25. The Court finds that Homes Today and Steve Stutts repossessed the mobile home with actual knowledge of Smith's bankruptcy filing and in willful disregard of the automatic stay. 11 U.S.C. § 362.

Stutts later returned the mobile home to the lot on which it had been sitting. However, the mobile home was not secured, steps were not put in place, plumbing and electricity were not reconnected and the front door was broken. As a result the residence was not habitable. The interior of the mobile home was a shambles. While Smith did not own any personal property of extraordinary monetary value, irreplaceable personal effects were lost. Most notably, photographs and home movies of her deceased son were lost as a result of the forcible and unlawful taking of the mobile home. As a result of the callous, if not brutal, taking of the residence, Smith became homeless, lost her job, suffered from stress and depression and ultimately sought psychiatric treatment. Smith was treated with therapy and medication for her psychological condition.

Stutts and Homes Today violated the automatic stay in a willful and malicious manner, calculated to humiliate Smith and cause her emotional distress. That Smith did not have equity in her mobile home and that her personal property was of only nominal monetary value does not mean that she did not sustain actual monetary damages. Having heard the testimony of witnesses, having reviewed the documentary exhibits including photographs and having considered the arguments of counsel, the Court finds that Smith sustained actual damages for the loss of her belongings in the amount of $1,400.00 *See* Schedule B.[2] (Doc. 1–main case). The Court further finds that the Debtor has suffered actual damages for lost wages and emotional dis-

---

1. Reference is made to documents in the Court's Adversary Proceeding file using the convention (Doc. X). Reference to documents in the Chapter 13 case file, or main case file, using the convention (Doc. X—main case).

2. The Court will take judicial notice of its own record in this case. Schedule B, attached to the Debtor's petition, lists the Debtor's personal property. The Schedule reflects that Debtor had $400.00 of wearing apparel and $1,000.00 of household goods located inside her mobile home. (Doc. 1–main case).

tress arising from the wrongful repossession of her mobile home. This emotional distress was the result of: (a) having been rendered homeless; (b) the loss of her job; (c) the destruction of her personal effects (including the loss of photographs and home movies of her deceased son); and (d) the humiliation resulting from deplorable manner in which she was treated by Stutts. The Court finds that Smith should be awarded actual damages for lost wages and emotional distress in the amount of $25,000.00.

## II. CONCLUSIONS OF LAW

The Plaintiff seeks money damages for the creditor's violation of the automatic stay. This court has jurisdiction to hear this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court will discuss the following issues: (a) whether there was a violation of the automatic stay; (b) whether actual and punitive damages should be awarded; (c) the Defendants' motion for directed verdict; (d) the effect of the Defendants' failure timely to file lists of exhibits and witnesses; and (e) whether attorney's fees should be awarded.

### a. THE AUTOMATIC STAY

To determine whether a violation of the automatic stay has occurred, the Court will look to Section 362 of the Bankruptcy Code, which provides, in part, that:

(a) ... a petition filed under section 301 ... operates as a stay, applicable to all entities, of—

\* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

\* \* \*

(h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362. To recover in this instance, the Plaintiff must show two things: (1) that a petition had been filed; and (2) that the Defendants committed an act to obtain possession of property of the estate. This Court's record shows that Plaintiff Barbara Smith filed a petition in bankruptcy on August 27, 2002, under Case No. 02–81180. As set forth in this Court's Findings of Fact *supra*, Defendants Steve Stutts and Homes Today, took possession of Smith's mobile home on August 28, 2002, one day after the filing of the petition. The Defendants were given actual notice of the bankruptcy filing and shown a copy of the petition in bankruptcy. The Defendants' actions in taking possession of the mobile home were willful in that they knew of the bankruptcy filing and the existence of the automatic stay.

The final question on the issue of liability is whether the mobile home in question was property of the estate. Smith does not have a certificate of title issued in her name. The Defendants have attached a copy of a certificate of title which purports to be issued in the name of Willie Frank or Annie M. Dowdell. This document appears to suggest that someone other than Smith owns the mobile home in question. Before reaching the merits of this contention, the Court will first consider two preliminary matters.

The first problem with the proffered certificate of title is that it was not offered into evidence. The Court may not properly consider evidence proffered after trial by way of a post trial brief. (Doc. 28). The Defendants failed timely to file lists of

exhibits, witnesses and contentions. *See* Doc. 11 (Scheduling Order). When called upon to explain this at trial, counsel for the Defendants ignored the Court's request, electing instead to move for a directed verdict. Transcript, 5/28/2003, p. 63. The events leading up to this are discussed in detail in Section II(d) below. Because the certificate of title was not offered into evidence, it should not be considered.

The second problem with the proffered Certificate of Title is that the Vehicle Identification Number (VIN) on the Certificate of Title does not match the VIN on the contract.[3] The contract indicates a VIN of GAFLS75A24268–W11, while the Certificate of Title indicates a VIN of GAFL275A24266WE11. While the numbers are close, the Court will not accept the proffered Certificate of Title because it is not established that the two documents refer to the same mobile home.

Even if the Court were to consider the proffered certificate of title, it would nevertheless reach the conclusion that Smith had an interest in the mobile home. Smith's right to possession of the mobile home is property of the bankruptcy estate. *See Southtrust Bank of Alabama, N.A. v. Thomas (In re Thomas),* 883 F.2d 991, 996 (11th Cir.1989). The right to possession unlawfully was cut off by the Defendants' actions in this case. In addition, the Court finds that Smith owned valuable contract rights in the home. Those contract rights are property of the estate. That a certificate of title had not been issued in Smith's name does not affect the outcome of this

Adversary Proceeding. Pursuant to the terms of her contract with Homes Today, Smith had a contractual right to have title transferred to her upon payment of the purchase price. Her interest in the mobile home is substantially the same as one who holds title subject to a security interest. Indeed, if the Defendants' argument was accepted at face value, no property which was subject to a security interest would be property of the estate.

The filing of a petition in bankruptcy creates an estate. 11 U.S.C. § 541. The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.; see United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203–205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Smith acquired an interest in the subject mobile home on September 24, 2001, when she entered into a contract to purchase the mobile home. That contractual interest became property of the estate at the time she filed her petition in bankruptcy.[4] Therefore, by taking possession of the mobile home after the filing of the petition in bankruptcy, the Defendants committed a violation of the automatic stay.

#### b. DAMAGES

##### 1. Actual Damages

Having found a violation of the automatic stay, the Court next considers whether an award of damages is appropriate. Section 362(h) provides that "[a]n individual injured by any willful violation of the automatic stay shall recover actual damages,

---

3. The contract was offered into evidence as Plaintiff's Exhibit C. The proffered Certificate of Title is attached to the Defendants' post trial brief. (Doc. 28).

4. The *Thomas* case involved a purchase money security interest in a mobile home. The Court found that the Debtor's right to possession was property of the bankruptcy estate.

*Thomas,* 883 F.2d at 996. However, the *Thomas* Court did not address whether any contract rights would be property of the estate. The undersigned has examined the contract in this case and specifically finds that Smith acquired valuable contract rights at the time the contract was formed. (September 24, 2001).

including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). Because the Court has found, as a factual matter, that the violation of the automatic stay was willful, it must award Smith actual damages as well as costs and attorney's fees.

■■■ In a recent decision of the United States Court of Appeals for the First Circuit, the question of whether a violation of the automatic stay was willful stated as follows:

> A willful violation [of the automatic stay] does not require a specific intent to violate the automatic stay. The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation. *See Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989); *see also Crysen/Montenay Energy Co v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2nd Cir.1990); *Cuffee v. Atlantic Bus. and Community Dev. Corp. (In re Atlantic Business and Community Corp.)*, 901 F.2d 325, 329 (3d Cir.1990). In cases where the creditor received actual notice of the automatic stay, courts must presume that the violation was deliberate. *See Homer Nat'l Bank v. Namie*, 96 B.R. 652, 654 (W.D.La.1989). The debtor has the burden of providing the creditor with actual notice. Once the creditor receive actual notice, the burden shifts to the creditor to prevent violations of the automatic stay. *See Mitchell Const. Co., Inc., v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr.N.D.Ga.1995).

*Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.1999) (bracketed

matter added); *see also Jove Engineering, Inc. v. Internal Revenue Service*, 92 F.3d 1539, 1555 (11th Cir.1996) ("willfulness generally connotes intentional action taken with at least callous indifference for the consequences").

In *Kaneb*, the First Circuit, let stand an award of $25,000.00 for "emotional distress" as a result of the wrongful filing of a complaint to foreclose a mortgage. *In re Kaneb*, 196 F.3d at 270. After Kaneb filed a Chapter 13 petition in bankruptcy, Fleet Mortgage moved for relief from the automatic stay. The motion was denied by the bankruptcy court. As a result of a miscommunication among counsel, a foreclosure complaint was filed in state court in violation of the automatic stay. Kaneb's lawyer promptly notified Fleet Mortgage of the violation. No subsequent action was taken on the complaint. Judgment was not entered, a foreclosure sale was not scheduled, advertised or held, nor was Kaneb physically removed from his residence. However, Fleet Mortgage's lawyer did not dismiss the complaint for six weeks. In the meantime, Kaneb's neighbors learned of the suit and, as a result, stopped inviting him to social outings which caused him to lose sleep and worry. *Id.* at 266–67. The emotional distress suffered by Kaneb pales in comparison to that suffered by Smith in the case at bar.

■■■ Comparison of the facts of this case, with those in *Kaneb*, demonstrates that the damages awarded in this instance are not excessive and that an award of compensatory damages for emotional distress is appropriate under the circumstances. Damages for emotional distress are not easily quantified. Moreover, the Court will assume that Smith did not have a significant amount of equity in her mobile home.[5] Upon consideration of the evi-

---

5. The Defendants' submission of a certificate of title in the name of a third party is not a

dence and testimony presented, the Court determines that an award of $25,000.00 for emotional distress is appropriate in this instance.

As the Court has found that Defendants Homes Today and Stutts willfully violated the automatic stay when they repossessed Smith's mobile home, the Court is required to award actual damages. As set forth above, the Court has found that Smith sustained actual damages, for the loss of her belongings, in the amount of $1,400.00. In addition, the Court has found that she has suffered actual damages for lost wages and emotional distress in the amount of $25,000.00.

### 2. Punitive Damages

 Section 362(h) grants the bankruptcy court the discretion to award punitive damages "in appropriate circumstances." The Bankruptcy Code does not attempt to delineate further what this means, leaving it to the sound discretion of the court. The Court will examine two cases in which punitive damages have been awarded and compare the facts of those case with the facts in the instant proceeding. Having undertaken this comparison, the Court concludes that the facts of this Adversary Proceeding are sufficiently egregious to justify an award of punitive damages in the amount of $25,000.00, in addition to the actual damages discussed above.

The Tenth Circuit Bankruptcy Appellate Panel sustained an award of punitive damages in the amount of $40,000.00 against a bank which had repossessed an automobile in violation of the automatic stay. *Diviney v. NationsBank of Texas, N.A. (In re Diviney),* 225 B.R. 762 (10th Cir. BAP 1998). In *Diviney,* the bank held a security interest in an automobile which was valued at $3,000.00. The bank was paid in full on its secured claim. Following the debtor's default in payments under the Plan, the case was dismissed, to be reinstated a short time thereafter upon the debtor's motion. The bank repossessed the automobile after the case had been reinstated, with knowledge of the reinstatement. Mr. Diviney lost his job as a pizza delivery man as a result of the repossession. *In re Diviney,* 225 B.R. at 764–68. The bankruptcy court awarded actual damages in the amount of $2,850.00, punitive damages in the amount of $40,000.00 and attorney's fees in the amount of $15,000.00, for a total of $57,850.00. *Id.* at 768–69. The decision of the Bankruptcy Appellate Panel in *Diviney* provides further support for an award of punitive damages here.

Likewise, the facts of the case at bar are similar to a case decided by a Bankruptcy Judge in Oklahoma twelve years ago. *Fry v. Today's Homes, Inc. (In re Fry),* 122 B.R. 427 (Bankr.N.D.Okla.1990). In *Fry,* a secured creditor, with knowledge of the

---

point in their favor. Under the terms of their contract with Smith, Homes Today was under a duty to transfer title to her upon payment of the purchase price. If they are not able to do so, they are potentially liable for damages for breach of contract and possibly fraud. There is nothing in the evidence to suggest that Homes Today actually had title to the mobile home. However, if we assume that Homes Today was the owner, or at least had a legal means of obtaining title to the mobile home so that it could in turn transfer title to Smith, it has a serious problem defining its interest in the property. As a general rule, a creditor who fails to perfect its security interest is relegated to ranks of unsecured creditors. Therefore, Homes Today may be nothing more than the holder of an unsecured claim. Because Smith did not raise that issue here, the Court need not consider the matter further. The Court notes that the question as to who actually holds title to the mobile home has not been resolved and need not be resolved in this proceeding. All that is necessary here is for the Court to find that Smith owned valuable contract rights in the mobile home and that those contract rights became property of the estate.

bankruptcy filing, repossessed a mobile home "knowingly, intentionally, wilfully and with a complete disregard of the rights of the Debtors in the property." *Id.* at 429. The Court awarded actual damages in the amount of $8,665.00 and punitive damages in the amount of $25,000.00. *Id.* at 431–33. The Court also awarded attorneys fees and expenses, bringing the total award to more than $57,000.00. *Id.* at 433.

In *Fry*, the Debtors had moved out of the mobile home and had discontinued utility services. *Id.* at 431. In the case at bar, Smith was living in the property. Indeed, she had to jump from a moving mobile home to the ground because the steps had been removed while she was physically inside her residence. The repossession in this instance was done in a much more egregious fashion than was the case in *Fry*. The Court in *Fry* specifically found that there were no actual damages as a result of the taking of the mobile home, rather the damages flowed from the loss of the Debtor's belongings which were contained in the home and lost as a result of the repossession. *Id.* at 432. While Smith in this case suffered the loss of her belongings as did the Debtors in *Fry*, her damages were far greater in that she was rendered homeless as a direct result of the Defendants' wrongful repossession of her residence. The damage award in *Fry* lends further support for the proposition that Smith should be awarded substantial damages for the harm she suffered as a result of Defendants' actions.

Once it is determined that an award of punitive damages is appropriate, the Court must fix the amount to be awarded. This Court finds that the following factors are determinative here. First, the repossession was undertaken in a callous, if not brutal manner. Smith told Stutts of the bankruptcy filing and offered to show him

her papers. Stutts had the mobile home taken while Smith was still inside. Smith had to jump from a moving mobile home. Second, the repossession left Smith homeless and resulted in the loss of her employment. The consequences of the wrongful repossession were devastating. Third, the mobile home was returned in such a damaged condition that it was uninhabitable. Moreover, utility service was disconnected and not reconnected after the unlawful repossession. The condition and manner in which the mobile home was returned was an insult. Stutts unlawfully took Smith's home from her and returned a useless pile of junk.

If the Bankruptcy Code and the rights it guarantees are to have meaning, punitive damages in an amount sufficient to deter conduct such as this in the future, both by Stutts and by others similarly situated, must be imposed. One of the most important purposes of Chapter 13 of the Bankruptcy Code is to permit wage earners to propose a plan so that they can keep their residence. The plan filed by Smith in this Chapter 13 bankruptcy case is designed to cure the contract arrearage owed to Homes Today and Royal Park Estates and enable her keep her home. If the Defendants felt that Smith had done something improper, they could have taken action in this Court. For example, they could have sought relief from the automatic stay, objected to confirmation of the Plan, or moved to dismiss the case. They did none of those things. If actions such as those taken by Stutts are not deterred, the purpose of Chapter 13 will be undermined and the protections designed by Congress will become meaningless. A substantial award of punitive damages is necessary to deter such conduct in the future. Based on the evidence presented and the Court's observation of the demeanor and bearing of Stutts and his counsel in Court, an award

of punitive damages in the amount of $25,000.00, in addition to the compensatory damages discussed above, is appropriate.

### c. DEFENDANTS' MOTION FOR DIRECTED VERDICT

At the close of the Plaintiff's case-in-chief, the Defendants moved for what they termed "directed verdict." Since 1991, the Federal Rules of Civil Procedure have not used the term "directed verdict," instead referring to the motion as one for "judgment as a matter of law." *See* FED. R. CIV. P. 50(a). Because this Adversary Proceeding was not tried to a jury, the Court will construe the Defendants' motion as one for judgment on partial findings. FED. R. CIV. P. 52(c), made applicable to adversary proceedings in bankruptcy by FED. R. BANKR. P. 7052. Rule 52(c) provides as follows:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

FED. R. CIV. P. 52(c).

■■■ The standard to be applied to such motions was recently articulated in a decision of the United States District Court for the Southern District of Alabama.

[T]he Court may resolve conflicts in the evidence as well as make credibility assessments. *Stearns v. Beckman Instruments, Inc.*, 727[737] F.2d 1565, 1568 (Fed.Cir.1984). Additionally, the Court should evaluate the evidence without making any special inferences in favor of the non-moving party and should resolve the case on the basis of a preponderance of the evidence. *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970).

*Wells v. Brown & Root, Inc.*, 65 F.Supp.2d 1264, 1268 (S.D.Ala.1999).

■■■ Turning to the merits of the Defendants' motion, they argue that Steve Stutts and Homes Today were acting as agents for Royal Park Estates. They further argue that when the Plaintiff dismissed Royal Park Estates and Richard Dale Massey as named defendants pursuant to a settlement agreement, that Homes Today and Steve Stutts were thereby released as well. The Court rejects this argument for two reasons. First, as a factual matter, the Court finds that Steve Stutts and Homes Today were not acting as agents for Royal Park Estates but rather were acting on their own behalf. Second, as a matter of law, the universe of those who may be held liable for a violation of the automatic stay is not limited to secured parties. Any entity which takes possession of property of the estate in violation of the automatic stay may be held liable regardless of their status. Therefore, even if the Court were to find that both Stutts and Homes Today were agents for Royal Park Estates, they could still be held liable for a violation of the automatic stay independent of the liability of Royal Park Estates.

■■■ The Defendants argue that "[t]here are only two situations when an agent can be liable for actions done on behalf of his principal," Doc. 28, p. 2–3 (citing *Warehouse Groceries, Inc. v. Scottsboro Newspapers Inc.*, 457 So.2d 979 (Ala. Civ.App.1984)). The Defendants further contend that these two situations are: (1) when the agent exceeds the scope of his authority; and (2) when the agent fails to

disclose the identity of the principal. *Id.* The case Defendants cite stands for nothing more that the well established proposition that where an agent enters into a contract on behalf of an undisclosed principal he may be held liable on the contract. *Warehouse Groceries,* 457 So.2d at 980. It does not then follow that these are the only two situations in which liability may be imposed on an agent. It is well established that an agent may be held liable for torts committed while acting on behalf of a principal. *Sieber v. Campbell,* 810 So.2d 641, 645 (Ala.2001) (citations omitted). Because liability pursuant to Section 362(h) is not predicated upon the existence of a contract and because it applies to "any entity," liability under this section is more akin to liability *ex delicto* than *ex contractu.* The Defendants' argument is rejected for two reasons. First, the evidence does not support a finding of fact that Stutts and Homes Today were agents of Royal Park Estates. Second, even if the Defendants were agents, they may nevertheless be held liable for a willful violation of the automatic stay.

The Defendants make a second argument as to the measure of damages. The Defendants contend that "[i]t would be impossible for the plaintiff to experience monetary losses when her source of income is from social security disability." (Doc. 28, p. 4). The Defendants do not cite any authority in support of this remarkable proposition. If that were so, anyone might visit any number of atrocities on a social security recipient and defend on the grounds that there are no damages because that person is incapable of experiencing monetary loss. This proposition is rejected.

The remainder of the Defendants' brief consists of an attack on Smith's credibility.

The Court heard Smith's testimony, observed her demeanor and considered documentary evidence as well as the testimony of other witnesses and finds that she is forthright and credible. The Court rejects the Defendants' request that the Court find that Smith is not credible. The Court finds that the Defendants' motion for directed verdict, or more properly for judgment on partial findings, is without merit and is therefore DENIED.

### d. DEFENDANTS FAILED TIMELY TO FILE LISTS OF EXHIBITS, WITNESSES AND CONTENTIONS

After the close of the Plaintiff's case, the Court advised the Defendants that it was considering whether to take the case under advisement without hearing the Defendants' witnesses or considering any documentary evidence. Transcript 5/28/2003, p. 63. The Court's pretrial order required the parties to file lists of witnesses and exhibits by March 19, 2003. (Doc. 11). However, the Defendants did not file their lists until May 20, 2003, which was only one week prior to trial. (Docs.21, 22). Because the Defendants did not respond to the Court's inquiry, the Court finds that further consideration of this issue is waived. *See* Transcript 5/28/2003, p. 63.

Additional discussion of the conduct of Defendants' counsel is appropriate here. On October 31, 2002, the Court entered an order setting a scheduling conference, with counsel to appear telephonically. (Doc. 5). The conference was to take place on December 3, 2002, at 9:00 a.m. The Court's order indicates that a copy was sent to Daniel W. Lee, Attorney for the Defendants. On December 3, 2002, between 9:00 a.m. and 10:00 a.m. the Court's Courtroom Deputy placed a call to the telephone number indicated on the last pleading filed by Mr. Lee.[6] The Courtroom Deputy was

---

6. The Court's October 31, 2002, order states, in part, that "**each party desiring to be heard**

advised by a woman who answered the telephone that Mr. Lee was not in the office. Charles Ingrum, counsel for the Plaintiff, was available. Mr. Ingrum admitted that he had not spoken to Mr. Lee, contrary to the provisions of the October 31, 2002 order.

On December 9, 2002, the Court entered an order to show cause, calling for Mr. Lee's appearance in court in Montgomery, Alabama on January 7, 2003. (Doc. 7). Mr. Lee was to answer as to three items: (1) why his pleadings should not be stricken from the record as he was not a member of the bar of the United States District Court for the Middle District of Alabama, nor had he sought admission *pro hac vice;* (2) why sanctions should not be imposed for failure to comply with the Court's order of October 31, 2002, which required counsel to confer regarding the matters described in FED. R. BANKR. P. 7026(f); and (3) why sanctions should not be imposed for his failure to make himself available for the December 3, 2002, scheduling conference. (Doc. 7).

The Court held a hearing on January 7, 2003, and both Mr. Lee and Mr. Ingrum were present. Because Mr. Lee moved for admission *pro hac vice* in advance of the hearing, the Court considered item number (1) closed. *See* Doc. 8 (Motion to Appear Pro Hac Vice). As for item number (2), the Court notes that Mr. Lee claimed that he attempted to telephone Mr. Ingrum on one occasion. The Court notes that both counsel appear to be equally culpable. As for item number (2), both counsel were admonished to communicate with one another in the future. Transcript 1/7/2003, p. 10. No other action was taken regarding item number (2).

As for item number (3), Mr. Lee's failure to appear for the December 3, 2002, telephonic conference, the following colloquy occurred:

THE COURT: I guess my first question is we had a status conference a couple of weeks ago and nobody was here for the defendants and I was curious as to why?

MR. LEE: Your Honor, the way I read the notice that was issued was that there would be a teleconference and that I was to provide the court with my phone number and that the court would initiate or the clerk would initiate the call, and I was at the number and didn't get a call and, if I did, I didn't know about it, and that is the way I understood it, not to appear here but to—

THE COURT: Well, that is right, It was teleconferenced. My understanding was we called this number and we were told that you weren't there and they didn't know where you were.

MR. LEE: I have not had one record of a call, Your Honor. I don't dispute the court's statement or the way the court got the information you just gave me but I state my place that I was in my office. I had three closings that day as a matter of fact, and it did not cross my mind again until I got the court's order to be here today.

Transcript, 1/7/2003, pp. 2–3.

At the time, the Court found Mr. Lee's statement to be perplexing. The Court conducts telephonic hearings on a regular basis. It expects that counsel will make themselves available. If for any reason counsel is not available, they should make the fact known to the Court in advance, with the best available notice to opposing

must furnish the clerk of court, *in advance,* a telephone number to be used and keep the line open *at least one hour* for the hearing." (Doc. 5) (emphasis in original). In violation of the Court's order, Mr. Lee failed to telephone the Clerk's office and provide a number.

counsel. Rarely, counsel are not available for telephonic conferences and have not given prior notice of their unavailability. When this happens, the absent counsel almost always contacts the Court promptly, either with an apology if the matter was somehow overlooked, or an explanation if the absence was due to circumstances beyond his control. Basic notions of common courtesy dictate how counsel should handle such matters.

The undersigned does not recall ever telephoning a lawyers' office and being advised that a lawyer was not present when, in fact, he was in his office. That is not to say that it is not possible for such an event to occur. The Court expects that counsel will train their staff adequately so that when a telephone call from the Court is received, it is forwarded promptly to counsel. Indeed, on the day of a telephonic hearing, counsel would be well advised to alert the staff member who answers the telephone that the Court will be calling. When confronted with Mr. Lee's explanation, the Court was left with two alternatives. First, the Court could assume that Mr. Lee was telling the truth and excuse his failure to appear. Second, the Court could conclude that Mr. Lee was lying and impose an appropriate sanction. While the first alternative seems improbable in any reasonably well run law office, the Court was, at that time, reluctant to find that counsel had not been truthful. The Court chose the first alternative and proceeded with the scheduling conference.

During the January 7, 2003 conference, the Court gave counsel the following warning:

> THE COURT: I am going to enter one of our standard pretrial orders on this. It is going to put you under an obligation to exchange things, like a list of witnesses, a list of exhibits, maybe something in there about contentions. If you show up with a witness or an exhibit which has not been on a list which you filed in advance and served on opposing counsel, you are not going to be able to either call the witness or offer the document into evidence. So I would suggest you take care in what you file and make sure you disclose all of your documents and exhibits.

Transcript 1/7/03, p. 9.

The Court followed up with an order which provides, in part, as follows:

> Counsel for the parties shall exchange and file with the court by **March 19, 2003** the pretrial disclosure required by Fed. R. Bankr.Proc. 7026(a)(3). Exhibits, depositions, and the testimony of witnesses not so disclosed shall not be admitted into evidence at the trial except for good cause shown.

(Doc. 11) (emphasis in original).

 Notwithstanding the fact that Mr. Lee had been given both verbal and written instructions that witness and exhibit lists were to be filed and served by March 19, 2003, he failed to file his lists until May 20, 2003, more than two months late and only one week prior to trial. It is well established that the Court may enforce the provisions of a pretrial order and exclude evidence which is not properly disclosed. *United States v. Prather*, 205 F.3d 1265, 1271–72 (11th Cir.2000) (tape recording excluded for failure to disclose in violation of pretrial order); *United States v. Koziy*, 728 F.2d 1314, 1320–21 (11th Cir. 1984) (testimony of undisclosed witness properly excluded); *Huntington Center Partners, Ltd., v. Dupree (In re Dupree)*, 197 B.R. 928, 933–34 (Bankr.N.D.Ala.1996) (undisclosed witnesses and exhibits excluded).

The Eleventh Circuit in *Koziy* enunciated six factors that a court should consider:

(1) bad faith on the part of the part[y] seeking to call the witnesses not listed in his pretrial memorandum, (2) ability of the party to have discovered the witnesses early, (3) validity of the excuse offered by the party, (4) willfulness of the party's failure to comply with the court's order, (5) party's intent to mislead/confuse his adversary, and (6) importance of excluded testimony.

*Koziy,* 728 F.2d at 1320-21 (citations omitted). The Court will consider each of the six factors in turn.

First, the Court is to consider bad faith. The Court notes that this is not the first time counsel has failed to follow instructions. Counsel failed to appear for a pretrial conference and then advised that he was in his office all along. Having observed the demeanor and bearing of counsel at trial and noting that counsel was warned both verbally and in writing to submit lists of exhibits and witnesses by March 19, 2003, the Court concludes that counsel has acted in bad faith.

Second, the ability of the party to have discovered the witnesses and documents early. Counsel was present in Court with Defendant Steve Stutts and an unidentified man. As for documents, counsel has proffered only one document, the Certificate of Title which was attached to the Defendants Brief. Doc. 28. There is nothing in the record to suggest that counsel was not aware of his witnesses and document in time to comply with the Court's pretrial order.

Third, the Court is to consider validity of the excuse offered by the party. As Counsel has not offered any excuse, this is not possible. *See* Transcript, 5/28/2003, pp. 63-65. Fourth, the willfulness of the party's failure to comply. The Court has had the opportunity to observe counsel's actions in this Adversary Proceeding and concludes that counsel's failure to comply

with the Court's pretrial order was willful. Fifth, the Court is to consider the party's intent to mislead/confuse his adversary. The Court is of the view that counsel's purpose in filing his witness and exhibit lists two months late, and on the eve of trial, was to harass opposing counsel. Sixth, the Court is to consider the importance of the excluded testimony. Because counsel did not make a proffer at trial, nor did he even identify one of the individuals with him, it does not appear that any evidence of importance was excluded.

### e. *ATTORNEY'S FEES*

▆▆▆▆▆ At the end of the hearing, the Court instructed Plaintiff's counsel to submit an affidavit in support of his claim for attorney's fees within 15 days and required the Defendants to respond in an equal amount of time. In response, Plaintiff's counsel submitted an affidavit seeking fees and expenses for a total of $6,783.91. (Doc. 25). The Defendants filed a brief with the Court but did not object to the claim for attorney's fees. (Doc. 28). The Court would first note that upon a finding that a willful violation of the automatic stay, the injured party "shall recover actual damages, including costs and attorneys' fees." 11 U.S.C. § 362(h). Therefore, the Court does not have any discretion as to whether attorney's fees should be awarded. As for the amount, the Court, exercising its independent obligation to examine an award of attorney's fees, finds that the amount requested appears to be reasonable. The Court takes into account the time spent on such services, the rates charged, whether the services were necessary and whether the services were performed within a reasonable time commensurate with the complexity, importance and nature of the issue. *See* 11 U.S.C. § 330(a)(3) (strictly speaking, Section 330 does not apply to an award of attorney's fees under Section 362(h); however, be-

cause Section 362(h) does not provide any guidance, the Court will look to Section 330(a)(3) for assistance in making its determination).

### III. CONCLUSION

The purpose of Chapter 13 of the Bankruptcy Code is to permit a wage earner to reorganize her affairs. Provisions in Chapter 13 permit a debtor to cure an arrearage on her house so as not to be lose possession of it. Section 362(a) imposes an automatic stay to enable debtors to seek the relief intended for them. The actions taken by the Defendants in this Adversary Proceeding are an anathema to these legitimate interests of the Debtor. This is one of the most aggravated instances of a willful violation of the automatic stay that this Court has seen. Stutts knew that Smith had filed bankruptcy, but nevertheless literally drove off with her home. Indeed, Stutts drove off with the mobile home knowing that Smith was still inside. But for the intervention of providence, Smith could have suffered injuries when she was forced to jump from a moving mobile home. The Court will award actual damages in the amount of $1,400.00 for the loss of personal property, $25,000.00 for lost wages and emotional distress, $6,783.91 for attorney's fees and expenses and $25,000.00 for punitive damages. The Court will, by way of a separate document, enter judgment in favor of Plaintiff Barbara Smith and against Defendants Homes Today, Inc. and Steve Stutts in the amount of $58,183.91.