**In re Janet L. SCHAFER, Debtor.**

**No. 04–18699 EEB.**

United States Bankruptcy Court,
D. Colorado.

Sept. 8, 2004.

James R. Chadderdon, Colorado Springs, CO, for Debtor.

John C. Eastlack, Colorado Springs, CO, for Creditor Air Academy Federal Credit Union.

## ORDER

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on a Motion for Relief from Stay, filed by Air Academy Federal Credit Union (the "Credit Union"), seeking to offset the balance of the Debtor's checking and savings accounts to the extent necessary to repay the balance owed by the Debtor on her line of credit with the Credit Union. The Debtor opposes the relief, claiming that the proposed offset is impermissible because the debts to be offset are not both pre-petition debts. The Credit Union has countered that the debts are subject to the equitable doctrine of recoupment and, thus, do not have to be mutual pre-petition debts. The Debtor also seeks a determi-

nation that the Credit Union violated the stay when it placed an administrative freeze on her accounts for six weeks before filing a motion, while making repeated requests for reaffirmation. Following an evidentiary hearing on this matter, the Court hereby FINDS and CONCLUDES as follows:

## I. Background Facts

The Debtor filed a Chapter 7 petition on April 26, 2004. On the date of her bankruptcy filing, the Debtor held $25.39 in a savings account and $693.34 in a checking account, for a total of $718.73. The Debtor also had a line of credit with the Credit Union, on which she owed $710.59 on the petition date. The Credit Union did not receive notice of the bankruptcy filing until May 5, 2004, when it immediately placed an administrative hold or "freeze" on both accounts. In the days between the bankruptcy filing and the notice to the Credit Union, however, several transactions occurred affecting her checking account balance. Several checks cleared the Debtor's checking account, totaling $887.23. The Debtor's employer made a direct deposit of her April 30, 2004 payroll check into her checking account. The Credit Union credited her with a $.30 dividend. On the date of the freeze, her checking account balance was $706.18, but the Credit Union froze only $693.34, representing the amount that she had held in her checking account on the petition date.

Following the imposition of the freeze, the Credit Union initiated written contact with the Debtor, through her attorney, to inform her of the freeze and to request that she reaffirm her line of credit debt. Unfortunately, her attorney did not inform her of the freeze and she learned of it only through notice that several of her checks had been dishonored. Upon discovery of the bounced checks, she visited the Credit

Union to demand an explanation. The representatives of the Credit Union expressed their discomfort in speaking directly with the Debtor when they knew she was represented by an attorney, but in the course of their discussions, these representatives suggested that she reaffirm the debt in order to reclaim her "good standing," which would enable them to remove the freeze.

The Credit Union also sent directly to the Debtor a form, which its representatives describe as an "informal" reaffirmation agreement. This form essentially recites a debtor's desire to continue making the same periodic payment on the balance of the debt and authorizes the Credit Union to send periodic statements and notices of past due payments. It recites the debtor's ability to cease making payments, but states that the Credit Union will be able to retain any "voluntary" payments made. It contains none of the disclosures required by 11 U.S.C. § 524, nor is this form agreement intended to be approved by the bankruptcy court. On the other hand, it does not contain any statements that the Court finds to be threatening or coercive by themselves.

In the course of several other letters and conversations, the Debtor's attorney demanded the release of the funds. When the discussions reached an impasse, the Credit Union filed a motion for relief from stay, approximately six weeks after it had placed a freeze on the Debtor's accounts.

## II. Is There a Valid Right of Setoff Under Non–Bankruptcy Law?

In the credit agreement at issue, the Debtor expressly granted the Credit Union a security interest in all funds held in accounts the Debtor has at the Credit Union as security for the line of credit. Colo. Rev. Stat. § 4–9–607(a)(4) allows a secured party to apply the balance of a deposit account in which it holds a perfected security interest toward the repayment of the obligation secured by the deposit account. When the secured party is a bank, a security interest in a deposit account is perfected if the account is maintained at that bank. Colo. Rev. Stat. § 4–9–104(a)(1). "Bank" is defined as an organization engaged in the business of banking, including credit unions. Colo. Rev. Stat. § 4–9–102(a)(8). Thus, the Credit Union held a valid and perfected right of setoff.

The Credit Union also had a right to exercise its setoff rights at the time of the bankruptcy filing. Despite the fact that the Debtor had not defaulted on any payments due under the credit agreement, the credit agreement provided several non-monetary events of default, including insolvency and the filing of bankruptcy. Both the Debtor's testimony and her bankruptcy schedules show that she was insolvent at the time of her filing.

## III. Does Section 553 Permit the Credit Union to Exercise its Right of Setoff?

The Bankruptcy Code does not confer on a party setoff rights that it does not have under non-bankruptcy law, but once such rights have been established, the Bankruptcy Code speaks to when a creditor may exercise those rights following a bankruptcy filing. Section 362(a)(7) sets forth a blanket prohibition against "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor," without first obtaining relief from the automatic stay. Section 553 sets forth additional limitations on the exercise of otherwise valid setoff rights, even if the creditor first complies with Section 362's mandate to seek stay relief. Many of the enumerated limitations are

not applicable to this case, but the primary one that is applicable is Section 553's limited application to mutual pre-petition debts. Section 553(a) applies only to "a mutual debt owing by such creditor to the debtor *that arose before the commencement of the case* under this title against a claim of such creditor against the debtor *that arose before the commencement of the case, ...*" (emphasis added). In other words, Section 553 limits a creditor's setoff rights following bankruptcy to the offset of mutual pre-petition debts. *In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir.1990).

 The only debt that the Credit Union seeks to offset is the Debtor's obligation under the credit agreement. This debt is clearly a pre-petition debt. Determining whether the debt owed by the Credit Union to the Debtor is a pre- or post-petition debt requires an analysis of the nature of the Debtor's claim against the Credit Union.

Under Colorado law, title to money deposited in a bank account passes from the depositor to the bank. *See Jefferson Bank & Trust v. United States*, 894 F.2d 1241, 1243 (10th Cir.1990); *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 736 (Colo.1991). The depositor becomes a creditor of the bank, *Mancuso*, 818 P.2d at 736, "and the money becomes a chose in action in favor of the depositor." *Jefferson Bank & Trust*, 894 F.2d at 1243; *see also In re Weninger*, 119 B.R. 238, 240 (Bankr.D.Colo.1990).

*In re Scott*, Civil Action No. 90–K–850 (D.Colo.1993)(unpublished disposition). Thus, the Debtor acquired a chose in action against the Credit Union with each deposit of funds. The funds frozen in the savings account, were deposited pre-petition, and thus represent a pre-petition claim against the Credit Union. But the Debtor's payroll check, deposited post-petition, gave rise to a post-petition claim

against the Credit Union. Consequently, Section 553 does not limit the Credit Union's setoff rights against the balance of the savings account, but it does prevent the Credit Union from setting off the funds representing the April 30, 2004 payroll check.

The Credit Union has argued that the Court need not consider the post-petition nature of its obligation arising from the post-petition payroll check because it has frozen only an amount that represents the amount existing in the Debtor's checking account on the date of filing. This argument fails to recognize the nature of the Debtor's claim against the Credit Union. As the Credit Union has pointed out in argument, once a depositor makes a deposit, it no longer has title to, or possession of, the funds, but merely a chose in action against the depository institution. Thus, the depository institution cannot treat the funds as a fungible *res*. Since Section 553 limits the Credit Union's ability to setoff to those pre-petition obligations that it owes the Debtor, the Credit Union must be able to trace the funds that it seeks to setoff to those which existed pre-petition. Each check that cleared the account post-petition, diminishing the pre-petition balance, eliminated a corresponding portion of the Debtor's choses in action against the Credit Union.

The Court recognizes that these checks cleared through no fault of the Credit Union, who had not yet been given notice of the bankruptcy. The Debtor's culpability in allowing the Credit Union's cash collateral to be dissipated will be addressed separately below. But the fact remains that each check that cleared the account reduced the Credit Union's indebtedness and, thus, its right of setoff. Courts examining this issue have applied a rule which limits the amount of setoff to the "lowest post-petition balance" before the deposito-

ry institution instituted the freeze. "To determine the amount covered by the still existing prepetition obligations, the court must look to the lowest postpetition balance because it 'is the only prepetition obligation on the account that has not been replaced by postpetition obligations.'" *In re Czyzk*, 297 B.R. 406, 409–10 (Bankr.D.N.J.2003)(citing *In re Kleather*, 208 B.R. 406, 415 (Bankr.S.D.Ohio 1997)).

Thus, Section 553 limits the Credit Union's right of setoff in this case to the unchanged balance of the savings account of $25.39 and the lowest post-petition balance of the checking account prior to the freeze of $24.40, for an aggregate amount of $49.79.

## IV. Does the Equitable Doctrine of Recoupment Remove Section 553's Limitation as Applied to the Credit Union's Claim?

 While Section 553 severely limits its right of setoff in this case, the Credit Union has argued that its claim is not subject to the pre-petition limitation set forth in Section 553, but is instead allowed under the doctrine of "recoupment." There is a widely recognized exception to Section 553's limitation found in the common law doctrine of recoupment:

This distinction arises from recoupment's origin as an equitable rule of joinder that permitted adjudication in one suit of two claims, both arising out of the same transaction, that otherwise had to be brought separately under the common law forms of actions. In the modern bankruptcy setting, this rule has evolved to permit a creditor to offset a claim that " 'arises from the same transaction as the debtor's claim,'" without reliance on the setoff provisions and limitations of section 553, because the creditor's claim in this circumstance is " 'essentially a defense to the debtor's claim

against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." ' Thus, so long as the creditor's claim arises out of the "same transaction" as defined under the recoupment doctrine, the creditor's claim may be offset against the debt owed without regard for the timing and other requirements stated in section 553 of the Bankruptcy Code.

*In re Davidovich*, 901 F.2d at 1537 (citations omitted). Reliance on this equitable rule, however, is problematic due to the inherent ambiguity in determining when two debts arise from the "same transaction." For this reason, in the absence of a clear Tenth Circuit precedent mirroring the facts of the particular dispute, creditors would be wise to seek relief from stay to effect setoff, even if they believe they have a claim for recoupment, as a precautionary measure.

 In the present action, the parties have a relationship as depositor and depository institution (the "banking relationship"). They also are both parties to a credit agreement (the "loan transaction"). The central question is whether these two separate relationships may be considered the "same transaction" by virtue of the interrelationship between them given the setoff rights against the Debtor's accounts contained in the credit agreement. In *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), the debtor also owed a pre-petition loan obligation to the bank and held a pre-petition chose in action against the bank to the extent of the account balance, but the Court was not required to consider the doctrine of recoupment, because both obligations were clearly pre-petition debts, the freeze occurred shortly after the filing, and the bank immediately sought stay relief.

In other contexts, courts have been reluctant to extend the doctrine of recoupment to separate contractual agreements between the depositor and the depository institution. For example, in *All Trac Transportation, Inc. v. Transportation Alliance Bank*, 306 B.R. 859 (Bankr. N.D.Tex.2004), the bank argued that the doctrine of recoupment shielded it from a stay violation claim when it had applied post-petition funds in a reserve account to pre-petition fuel debts owed to it by the debtor. The fuel debts were incurred pursuant to a fuel agreement (characterized by the court as a line of credit) between the bank and the debtor, whereby the debtor's drivers would charge fuel using credit cards that were advanced on the line of credit. The fuel advances were to be paid from funds in the reserve account maintained by the bank. The court held that recoupment did not apply because the funds in the reserve account derived from funds collected by the bank on purchased accounts under a factoring agreement, which it found to be separate from the debtor's obligations for the purchase of fuel under the fuel agreement. In *All Trac*, the parties had two separate, but related, agreements and the court found they did not arise from the same transaction.

A more restrictive interpretation of the doctrine of recoupment is found in *First Union National Bank of Florida v. Abbey Financial Corp.*, 193 B.R. 89 (Bankr. D.Mass.1996). In this case, the debtor had a checking account with the bank on which it issued two checks. At the time the checks were presented to the bank pre-petition, there were insufficient funds in the account to honor the checks. The bank held the checks for four days, waiting to see if sufficient funds would be deposited. When they were not, it returned the checks. Because the checks were not returned by the midnight deadline of the business day they were presented to the bank, the Federal Reserve sent the checks back to the bank, requiring that they be honored under banking law. When the first check came back, after the filing of the petition, there were sufficient funds to cover it in the debtor's account. The bank honored the pre-petition check, deducting the amount from the debtor's account post-petition. Before the second check was returned for payment, the debtor had transferred its account balance into its new debtor-in-possession account. Upon return of the second check for payment, the bank honored the check, but then filed an adversary proceeding, seeking both a determination of the validity of its post-petition chargeback of the first check and its claim for the return of the account balance it had "mistakenly" released to the debtor for deposit in its debtor-in-possession account.

Despite language in the depositor's agreement that allowed chargebacks, the court held that the chargeback of the first check was an impermissible setoff, rather than a recoupment. The court held that the actions of the bank were not part of the same transaction insofar as they did not fit within the rights set forth in the parties' depositor's agreement. The bank had not chosen to pay the check despite insufficient funds in the account. Instead, it had opted to return the check and it was the bank's late return of the check, not the honoring of the check despite insufficient funds as contemplated by the contract, which created the obligation of the debtor to the bank. Even though this case involved only one contractual agreement, the court found that the separate right that arose under statutory law, rather than the contract, was sufficient to take the matter outside the scope of recoupment.

Both of these cases illustrate the reluctance of courts to extend the recoup-

ment doctrine to various related, but separate, agreements, relationships, and common law or statutory claims that may exist between a depositor and its depository institution. The narrow application of this doctrine in the area of banking relationships reflects the general consensus that the doctrine of recoupment is to be construed narrowly. *In re B & L Oil Co.,* 782 F.2d 155 (10th Cir.1986); *In re Elec. Metal Prods., Inc. v. Honeywell, Inc.,* 95 B.R. 768 (D.Colo.1989). This narrow construction recognizes that recoupment is an exception to the general policy reflected throughout the Bankruptcy Code against preferring one creditor over another. It is also in keeping with Section 552(a), which essentially terminates a continuing security interest arising from a security agreement as to property acquired either by the estate or the debtor after the filing of a petition.

In the absence of a contrary controlling precedent, this Court finds that the banking relationship between the Debtor and the Credit Union and the loan transaction represent related, but separate, transactions. They constitute mutual obligations between the same parties, which give rise to rights of setoff, but not to a defense of recoupment. Accordingly, the Credit Union's right of setoff remains subject to the parameters of Section 553.

## V. Did the Credit Union Violate the Automatic Stay?

The Debtor claims that the Credit Union has violated the automatic stay in two ways. First, she contends that the administrative freeze on her accounts was tantamount to a setoff. Secondly, she claims that the repeated requests for reaffirmation coupled with the refusal to remove the freeze without a reaffirmation agreement were coercive acts designed to pressure her to reaffirm her pre-petition debt.

In *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), the Supreme Court validated an administrative freeze placed on a debtor's account while a bank sought stay relief to effect a setoff. In *Strumpf,* however, the bank filed a motion for stay relief within five days after imposing a freeze. Following *Strumpf,* courts have wrestled with defining when a "temporary" freeze becomes tantamount to a setoff. In *Town of Hempstead Employees Federal Credit Union v. Wicks,* 215 B.R. 316, 319 (E.D.N.Y.1997), the credit union froze the debtors' accounts for over four months before seeking stay relief. Both the bankruptcy court and the district court found that the credit union had violated the automatic stay. Based on the length of the freeze, the credit union's refusal to release the funds on request, and the fact that the credit union took no action until the debtors brought matters to a head, the district court concluded that the administrative freeze was not a temporary measure within the scope of *Strumpf,* "but rather constituted forbidden self-help in violation of the automatic stay." In *In re Orr,* 234 B.R. 249 (Bankr.N.D.N.Y.1999), the court found a stay violation when the credit union imposed a freeze for almost two months before seeking relief from stay.

Courts have also wrestled with determining what actions and communications are permissible in order to obtain a reaffirmation agreement. The Credit Union argues that *In re Duke,* 79 F.3d 43 (7th Cir.1996) provides a safe haven for lenders who solicit reaffirmation by sending the debtors and their attorneys a letter and form agreement offering new services in exchange for a reaffirmation agreement. The *Duke* court reasoned that Section 362 does not prohibit communication and negotiations between debtors and creditors. If the court read Section 362 so broadly as to

prohibit these negotiations, it would effectively render Section 524(c) & (d) meaningless. The *Duke* court, however, placed great emphasis on the fact that both the letter itself, and the context in which it was given, did nothing to create threatening or coercive pressure on the debtor.

■ In the present case, the Debtor's bank statements reflect that the credit line obligation remains outstanding and, thus, the Credit Union has not yet recorded an actual setoff. On the other hand, it delayed six weeks before filing for stay relief and waited until after the Debtor's attorney made threatening demands for the release of funds. Its actions were coupled with repeated requests for reaffirmation. While the amount of funds frozen is not always relevant, in this case the amount represents almost all of the Debtor's two-week paycheck. Given her monthly income and limited resources, the amount in question forces her to chose between paying her mortgage and meeting her daily needs for food and other basic necessities. In addition, the funds frozen did not represent the pre-petition balance that comprised the Credit Union's cash collateral. It froze her post-petition deposit, which was not subject to a continuing lien. 11 U.S.C. § 552(a).

This case demonstrates the fact specific nature of determining whether certain actions violate the stay. The Credit Union's letter and informal reaffirmation agreement, by themselves, are not coercive or threatening. The imposition of a temporary freeze by itself does not violate the stay. But what is the combined effect of withholding funds that represent a debtor's post-petition paycheck for over six weeks, coupled with repeated requests for reaffirmation, without bringing the matter before the court at the earliest possible opportunity? This Court finds that this particular combination of factors cannot

help but exert coercive pressure on a debtor, even if that is not the creditor's intention. These actions taken together constitute the kind of self help measures that are prohibited by Section 362.

Despite this finding, the Court recognizes that consumer and commercial banking practices depend on a certain amount of predictability and stability. How can a lending and depository institution, such as the Credit Union, set policies and practices into effect that will not run afoul of violating the automatic stay if these determinations are made on a case-by-case basis? The evidence in this case showed that the Credit Union has obviously sought counsel on how to comply with the Bankruptcy Code. Its initial form letter to the Debtor's attorney, it took care to refer to bankruptcy court decisions, showing that it has considered these issues before acting. The Credit Union's representatives were very careful to direct most of their communications to the Debtor's attorney and were reluctant to speak directly with the Debtor. By their actions, they demonstrate that they are trying to conform their practices to the law's requirements.

■ On the other hand, the Credit Union's intent to violate the stay, or lack of intent to do so, is not relevant to a finding of whether their actions were "willful." *In re Diviney*, 225 B.R. 762, 774 (10th Cir. BAP 1998). *See also, Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir.1990); *In re Atlantic Bus. and Cmty. Corp.*, 901 F.2d 325, 329 (3rd Cir. 1990); *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 290 (4th Cir.1986). In order for a violation to be "willful," evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the ac-

tions that violated the stay. A party's good faith belief that it has a right to certain property, or a right to take a certain action, is not relevant to a determination of whether the act was "willful" or whether compensation must be awarded. *In re Gagliardi*, 290 B.R. 808 (Bankr. D.Colo.2003). Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay. *In re Diviney*, 225 B.R. at 776; *In re Carrigg*, 216 B.R. 303, 304–5 (1st Cir. BAP 1998); *Taborski v. United States*, 141 B.R. 959, 966 (N.D.Ill. 1992); *In re Abrams*, 127 B.R. 239, 241–44 (9th Cir. BAP 1991). In effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing. It does not require an intent to violate the law.

How then can a creditor order its practices to avoid this liability? The answer is to bring a motion for stay relief before the Court at the earliest opportunity whenever it seeks to effect a setoff. This does not prevent the parties from engaging in negotiations after the fact. It might prove unnecessary in some instances. But it will prevent the second guessing that a court is forced to do in cases such as the present one. An ounce of prevention is worth a pound of cure.

## VI. Is the Debtor Entitled to Recover Damages?

The Debtor contends that she is entitled to recover the bad check charges assessed by the Credit Union when her checks bounced following the freeze on her account. She has also requested her attorney's fees incurred in prosecuting the motion for contempt. She has not requested, nor does the Court find a basis for, an award of punitive damages.

If the Court were free to weigh the relative equities in this case, it would not award any damages to the Debtor. The Debtor has also acted improperly in this matter. Section 363(a) defines "cash collateral," to include cash and deposit accounts. Section 363(c)(2) prohibits the trustee, let alone the debtor, from using a creditor's cash collateral without court authority or the creditor's consent, and then only in the operation of a business. This statutory restriction imposed an obligation on the Debtor to immediately notify the Credit Union of the bankruptcy filing so that it could take steps to prevent pre-petition checks from clearing post-petition. It also prohibits a debtor from writing any post-petition checks on an account, as long as a pre-petition balance exists. In this case, even if the Credit Union had not had a security interest in the account, then the trustee would have had a prior interest in the funds. The Debtor's Schedule C of exemptions does not list any amount of funds held as exempt. Consequently, this Debtor does not have clean hands. If the Court could, it would leave the parties where it finds them.

Unfortunately, the Court does not have this discretion. Once a court finds a violation of the stay to be willful, Section 362(h) makes the award of damages for injuries mandatory. *In re Mullarkey*, 81 B.R. 280, 284 (Bankr.D.N.J. 1987); *Tel–A–Communications Consultants v. Auto–Use (In re Tel–A–Communications Consultants, Inc.)*, 50 B.R. 250 (Bankr.D.Conn.1985). Neither "estoppel" nor the "unclean hands" doctrine bars a finding that a creditor has violated the automatic stay. *In re Cinematronics, Inc.*, 111 B.R. 892, 901 (Bankr.S.D.Cal. 1990); *In re Gustafson*, 111 B.R. 282, 288 (9th Cir. BAP 1990), *rev'd on other grounds*, 934 F.2d 216 (9th Cir.1991).

 Although the Court is bound to impose an assessment for any actual damages attributable to the stay violation, the Court finds that it does not have sufficient evidence before it from which to make this assessment. There was no evidence as to what legal fees and costs the Debtor has incurred. Any accounting will have to apportion the fees between those that are attributable to the stay violation motion and those which relate to defense of the Credit Union's motion for relief from stay. There was little or no evidence of the actual damages attributable to the bad check charges. The May 2004 bank statement reflects eleven charges of $22.00. However, the Court cannot discern what bad check charges would have been incurred if the Debtor had immediately notified the Credit Union of her bankruptcy filing, which would likely have resulted in the return of checks written on the pre-petition balance.

Finally, the Debtor's conduct in allowing the dissipation of the Credit Union's cash collateral may give rise to a post-petition claim against the Debtor. The Credit Union's act in violating the stay also occurred post-petition. The potential claims arising from these post-petition acts or omissions are not subject to Section 553. Section 553 prohibits an offset of pre-and post-petition debts, but neither Section 362 nor 553 purport to address the setoff of mutual post-petition debts. Thus, the Court finds that any assessment of damages under Section 362 should occur in the context of an adversary proceeding, which will allow the Credit Union to assert any counterclaims it may have.

## VI. Conclusion

Based on the foregoing, the Court hereby ORDERS that: (1) the Credit Union may setoff the balance of $25.39 held in the Debtor's savings account and the lowest post-petition balance held in the checking account prior to the freeze of $24.40, for an aggregate amount of $49.79; and (2) the Debtor must file an adversary proceeding in order to recover an award of actual damages against the Credit Union attributable to its violation of the stay.